**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Hugo MARIN and Virgilio Orlando Romero, Defendants-Appellants.**

Nos. 339, 349, Dockets 81–1300, 81–1301.

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1981.

Decided Jan. 18, 1982.

Harvey J. Golubock, Asst. U. S. Atty., New York City (Edward R. Korman, U. S. Atty., E. D. New York, Jane Simkin Smith, Asst. U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Edward Gasthalter, New York City (Hoffman, Pollok & Gasthalter, New York City, on the brief), for defendant-appellant Marin.

Edward M. Chikofsky, New York City (Marvin B. Segal, Segal & Hundley, New York City, on the brief), for defendant-appellant Romero.

Before OAKES, KEARSE, and PIERCE,[*] Circuit Judges.

KEARSE, Circuit Judge:

Defendants Hugo Marin and Virgilio Orlando Romero appeal from judgments of conviction entered after a jury trial in the United States District Court for the Eastern District of New York, Edward R. Neaher, *Judge*, for conspiracy to possess cocaine with intent to distribute it, in violation of 21 U.S.C. § 846 (1976), and for possession of cocaine with intent to distribute it, in violation of 21 U.S.C. § 841 (1976). Each defendant was sentenced to concurrent five-year terms of imprisonment on each count and a five-year special parole term on the possession count. At the trial, the government introduced, *inter alia*, a bag of cocaine that had been seized from Romero's car, and a redacted post-arrest statement made by Romero. On appeal, both defendants argue that their motions to suppress the cocaine were improperly denied. In addition, Marin argues that Romero's post-arrest statement, even as redacted, inculpated Marin and that its admission at trial therefore violated Marin's right of confrontation under the Sixth Amendment to the Constitution. In contrast, Romero contends that the redaction of his statement rendered the statement inculpatory of him and was therefore improper. Finding no merit in any of the defendants' arguments, we affirm.

---

[*] When these appeals were heard, Judge Pierce was a District Judge for the Southern District of New York, sitting by designation. He was inducted as a judge of this court on November 30, 1981.

## I.  FACTS

The events that led to the arrests of Romero and Marin on February 12, 1981, occurred during a narcotics investigation by the United States Drug Enforcement Administration ("DEA").  DEA agents and a DEA informant were the only witnesses at the suppression hearing or at trial.  Since defendants argue that the information possessed by the agents was insufficient to allow the agents to stop the automobile in which the cocaine was found, we describe the events in some detail.

### A.  *The Surveillances*

In October 1980 and January 1981, the DEA received information from two confidential informants that Rafael Mateus ("Mateus"), who resided at 105–20 37th Avenue, Queens, N.Y., was selling cocaine from his home.  On February 4, 1981, DEA agents, armed with a search warrant, positioned themselves outside Mateus's home and watched to determine whether the residents were at home.  At about 6:00 p. m., the agents observed Mateus's wife, Elilce Mateus ("Elilce") and an unidentified woman leave the building and drive away: DEA Special Agent Celerino Castillo III followed their car to the New York Hilton Hotel in Manhattan.  Elilce entered the lobby, followed by Agent Castillo who heard her ask a bellboy for directions and followed her to the eighth floor, where she knocked on the door of Room 849.  The door was opened by Marin, who was then unknown to Castillo.  Marin greeted Elilce, and, after letting her enter, stepped out, looked around, and reentered the room.

Castillo reported what he had observed to DEA Special Agent Alvin T. Hanna, who learned that Room 849 was registered to Hugo Marin: Hanna procured the adjoining room, number 850, for the DEA.  Agent Castillo, who was fluent in Spanish, went to Room 850, where he listened at the wall adjoining Room 849 until about 2:30 a. m.[1]  Castillo testified that he overheard conversations in Spanish in which, *inter alia*, Elilce

stated that it was necessary to be very careful with the New York City police.  At various points during the evening an unidentified female, and later a man, entered the room; shortly thereafter Elilce and the unidentified woman departed, leaving in the room Marin, a woman who Castillo thought was Marin's wife, and the recently arrived male.  During their conversation, the unidentified man stated that business in New York was very good and that New Yorkers liked good merchandise.

While Castillo was in Room 850, Agent Hanna remained in the lobby of the Hilton.  At about 11:00 p. m. Hanna saw Rafael Mateus in the lobby, followed him, and heard him say something to a bellboy about the eighth floor.  A short while later, Hanna observed Elilce Mateus and another woman leave the hotel and drive away.  He followed the women, who drove to Queens, immediately made a U-turn despite oncoming traffic and returned to Manhattan, drove around Manhattan for some 20 minutes, and then returned to Queens where additional U-turns were made.  Hanna gave up trying to follow them, and later that night saw them return to the Mateus residence where Hanna had resumed surveillance.

At some point during the night, Hanna put the names of Hugo Marin and Rafael Mateus into a DEA computer, the Narcotics and Dangerous Drugs Intelligence System ("NADDIS"), which maintained data about individuals associated with narcotics.  The computer yielded the information that there was a connection between Rafael and Marin, and that Marin was suspected of drug smuggling.

On the following day, February 5, Castillo, while stationed in the lobby of the Hilton, saw a man, later identified as Alberto Farradaz, a cousin of Romero, enter the hotel and walk around the lobby, eventually inquiring as to which elevator would take him to the eighth floor.  Castillo followed Farradaz to Room 849, where Farradaz was

---

1.  It does not appear that any of the surveillances in question were conducted with the aid of  electronic or mechanical devices.

greeted by Marin. Castillo entered the adjoining room and overheard Marin use the term "140,000."

On February 8, Castillo, again in a room adjoining 849 overheard Marin talking on the telephone. Marin told the caller that everything was fine, and that he was waiting for someone and would see the caller the next day. Castillo also overheard Marin's wife tell Marin that she had spent money on a "muestra." Castillo testified that in Spanish "muestra" means "sample," and that he knew, from his experience as a DEA agent, that the word is often used to denote a sample of narcotics.

On February 11, the Marins checked out of the Hilton, and, in the company of two unidentified women, drove away, with Agent Hanna following. The group drove to Queens, eventually arriving at the Holiday Inn at LaGuardia Airport, where the Marins checked into Room 736. Once more the DEA obtained an adjoining room. Eduardo DeMarzo, a Spanish-speaking DEA informant, arrived at the DEA's room between 11:00 a. m. and 1:00 p. m., and began overhearing conversations taking place in Room 736. DeMarzo heard a man engage in several telephone conversations, during which he mentioned the sum of $27,000, and stated that he was going to deliver two "aparatos." DeMarzo testified that the Spanish word "aparato" literally means gadget or appliance and that it is commonly used by cocaine dealers to refer to a kilogram of cocaine.

Agent Hanna, stationed outside the Holiday Inn, saw the Marins and an unidentified woman leave the hotel at about 5:00 p. m., and he followed them. After dropping off the woman at an apartment complex, the Marins drove on to a meat market at 86–10 37th Avenue in Queens, some blocks down the street from Mateus's home at 105–20 37th Avenue. The Marins were greeted outside the market; they went in, remained for thirty to forty-five minutes, and left carrying what appeared to be meat. The Marins next drove to an apartment house at 86–06 35th Avenue and went inside. Hanna had been informed by DeMarzo that the Marins had mentioned planning to attend a party that evening, so surveillance was terminated at 7:00 p. m. with the Marins still in 86–06.

Early the following afternoon, February 12, the Marins again left the Holiday Inn by car, followed by Hanna, and returned to the meat market. After remaining there some twenty minutes, the Marins drove down the street to the Mateus home. When they entered Mateus's building Marin's wife was carrying a large shoulder bag. After about an hour, Mateus left the building; and an hour after that, the Marins left. When they left, neither of the Marins was carrying the shoulder bag with which Mrs. Marin entered. The Marins again drove to the meat market, where they remained about an hour, then drove to the apartment house at 86–06 35th Avenue, and went inside.

Agent Hanna remained outside of 86–06, where he saw a white Thunderbird pull up and double-park beside the car the Marins had been driving. Minutes later Marin and two other men got into the Thunderbird; the three men drove away, followed by Hanna and other DEA agents. The Thunderbird parked in a shopping center at 86th Street and Roosevelt Avenue in Queens; there DEA Agent George Papantoniou saw the driver, later identified as one Carlos Lopez,[2] leave the car and enter a butcher shop on Roosevelt Avenue, while Marin and the other passenger waited in the car. A few minutes later Lopez returned to the car carrying a light brown plastic shopping bag. The Thunderbird then proceeded to the Bronx, where it entered the underground garage of an apartment house, and the agents lost sight of it. Eventually, the car left the garage, carrying only Lopez and Marin.

As the Thunderbird was being driven through the Bronx, a gray Cadillac with Florida license plates sounded its horn, and

2. Lopez was indicted as "JOHN DOE, also known as Carlos Lopez," but was never apprehended.

both cars pulled over to the side of the road. The Cadillac was driven by Romero, with Farradaz as his passenger. Romero got out and spoke with the occupants of the Thunderbird; Marin then got out of the Thunderbird and into the Cadillac. · The Thunderbird drove away, and the Cadillac remained parked, with Romero, Marin, and Farradaz in it. After a few minutes, the three men got out of the Cadillac and went into a bar. Some thirty minutes later, the Thunderbird returned and Lopez entered the bar. Minutes later, all four men left the bar. Marin, Romero, and Farradaz stood near the Cadillac while Lopez took a light brown plastic bag out of the Thunderbird and walked over to the Cadillac. Romero opened the trunk, and Lopez put the bag inside. Romero, Marin, and Farradaz then reentered the Cadillac and drove away. Hanna, along with four other cars carrying DEA agents, followed.

### B. *The Arrests*

The Cadillac proceeded to Queens, where it made several turns and two U-turns. When the cars were in the vicinity of 43rd Street, the pursuing agents, believing that their surveillance had been noticed, decided to stop the Cadillac. Hanna's car was directly behind the Cadillac, and at least three other DEA cars pulled up in front of it, so that it was prevented from moving. The agents got out of their car, with badges displayed, identified themselves as police officers and took Marin, Romero, and Farradaz out of the Cadillac. Although some of the agents who testified appeared uncertain as to whether the agents had drawn their guns in connection with the stop or had removed the occupants of the Cadillac from that vehicle by force, Agent Hanna stated that he had his own gun drawn, and gave the following general description:

Q When the cars surrounded the Cadillac did the agents open their doors very rapidly and run to the Cadillac?

A Yes.

Q Did they have guns drawn at that time?

A Yes, they did.

. . . . .

Q When you surrounded that car was the object to immobilize the passengers in that car as quickly as possible?

A Yes.

Q And in connection with that objective did the agents run to the car with their guns?

A Yes, I believe they did.

. . . . .

A [A]t least two of the people were taken out of the car.

Q In what manner?

A I'm not sure whether they were pulled out or just taken by the arm and taken out. . . .

. . . . .

Q Were they taken out by force?

A I'm sure that someone had their hands on them. But it wasn't like they were picked up out of the car.

Q Well, someone had their hands on them and had their gun on them; is that correct?

A That's correct.

Marin was patted down by the agents. While being patted down, Marin began to walk away; to keep him in place Papantoniou grasped him by the shoulder and held him.

Then, in a "conversational" tone, Papantoniou asked to whom the car belonged. Romero replied that it was his, and Papantoniou asked him for the car's registration. Romero indicated the glove compartment; both men got into the car and Papantoniou looked in the glove compartment. Then Papantoniou asked whether he could look around inside the car; Romero responded affirmatively and the agent searched the car, finding nothing significant. Papantoniou then asked whether Romero would open the trunk; Romero nodded, and opened it. Inside the trunk, Papantoniou saw a light brown, opaque plastic bag, which was the bag he had seen Lopez put into the trunk in the Bronx and was similar to the bag Lopez had earlier obtained from the butcher shop in Queens. The agent testified that the bag was unsealed but may

have been folded over at the top. Papantoniou asked Romero what was in the bag; Romero responded that the bag contained clothes. Papantoniou asked whether he could look inside the bag, and Romero nodded; Papantoniou opened the bag and saw two large packages that were sealed with masking tape and exuded an odor of cocaine. The agents then placed Romero, Marin, and Farradaz under arrest, handcuffed them, and took them to DEA headquarters.

### C. *Romero's Statement*

At DEA headquarters, Special Agent Terry Valentine advised Romero of his Fifth Amendment rights and Romero indicated that he understood. In response to the agent's questioning, Romero made a statement, which Valentine's notes summarized as follows:

1. On the evening of Thursday, February 12, 1981, Virgilio Orlando ROMERA [*sic*]-GUTIEREZ was arrested at Queens, New York by agents of the New York District Office. ROMERA [*sic*] was advised of his U.S. Constitutional Rights in Spanish by S/A Valentine, as witnessed by S/A Maddox.

2. ROMERA [*sic*] said he had known his co-defendant, Hugo de Jesus MARIN-RODRIGUEZ, for approximately six months. ROMERA [*sic*] said that he had known MARIN only as "Rolando" and that he had seen MARIN a few times in the last six months in a Miami Beach restaurant known to him as "POCASIO" where ROMERA [*sic*] formerly worked. ROMERA [*sic*] said he had driven from Florida with his cousin, Alberto FARRA-DAZ-ROMERA, in his wife's white Cadillac, and had been staying with relatives in Allentown, Pennsylvania.

3. ROMERA [*sic*] said that he and FARRADAZ were driving from Allentown to Union City, N.J. that night to visit some friends. From Union City, they drove to New York so that FARRADAZ could see Manhattan, according to ROMERA [*sic*]. He said that he made a wrong turn, however, and ended up in the Bronx instead. He said that he got off the Major Deegan Expressway at Ford-

ham Road and, seeing a restaurant, stopped to buy FARRADAZ a drink at approximately 8:00 PM. Inside the restaurant, which he said he had never seen before, he saw MARIN, whom he had not realized would be there.

4. ROMERA [*sic*] said MARIN asked him for a ride to 43rd Street in Queens. He said that once outside the restaurant, MARIN asked him to open the Cadillac trunk so that MARIN could place a vinyl bag in the trunk. After MARIN put his bag in the trunk, ROMERA [*sic*] said that all three then drove to Queens, as directed by MARIN, to the area of 43rd Street, where they were stopped by the agents. ROMERA [*sic*] said he did not know what was in MARIN's bag.

### D. *The Suppression Motions*

Prior to trial, defendants moved to suppress the cocaine, arguing that it had been seized unlawfully. They argued that the agents' stop of the car was justified by neither probable cause nor reasonable suspicion, and that the warrantless search of the trunk and of the plastic bag found in it therefore violated their rights under the Fourth Amendment to the Constitution.

After a hearing, Judge Neaher denied all of the motions. He ruled that the stop of the car was supported at least by reasonable suspicion, and perhaps by probable cause, generated by the evasive manner in which the car was driven and the agents' observation of the bag being placed in the car. He found further that Romero had consented to the search of the trunk, and additionally, that the search of the trunk was in any case lawful under the "automobile" exception to the warrant requirement. He also found the search of the bag itself justified, since the agents had reason to believe that the bag contained cocaine, based on their previous observations, on the information provided by the confidential informant, and on the odor emanating from the bag. Alternatively, Judge Neaher ruled that there was no expectation of privacy in the bag.

Each of the defendants also sought to preclude, although on divergent grounds, the introduction at trial of Romero's post-arrest statement. Romero argued principally that the statement was not made voluntarily and moved to suppress it. Marin, relying on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), argued that the statement inculpated him, and that its introduction at his trial would violate his Sixth Amendment right to confront his accusers; Marin thus moved to have his trial severed. The government opposed severance and offered to redact Romero's statement to omit the portions stating that Marin had asked Romero to open the Cadillac trunk so that Marin could place a vinyl bag in the trunk, and that Marin had thereupon put the bag in Romero's trunk. Neither defendant felt that the proposed redaction was proper. Marin contended that the remaining references to him—that Romero had known Marin in Florida as "Rolando", and that on the night of the arrests Marin had asked Romero to take him to 43rd Street in Queens—still inculpated Marin. Romero, for his part, contended that the redaction unduly prejudiced him because with the omission of the statement that it was Marin who put the bag in Romero's trunk, the jury was left with the impression that Romero had been silent as to the provenance of the bag. Romero asked that the statement either be introduced without redaction or not be used at all. He too moved for a severance.

Judge Neaher denied both defendants' motions. He ruled that Romero had made the statement voluntarily and that the proposed redaction would not violate his rights. The court ruled that Marin's rights would be adequately protected by the elimination of all statements relating to Marin's alleged placement of the bag in Romero's trunk. Accordingly, at the trial, Romero's statement, as redacted, was described as follows:

"Q. Will you please relate to the jury what you said and what Mr. Romero said?
A. I asked him where he was from and how he came to be in New York. He said he was from Florida and that he and his cousin, Alberto Feridaz [*sic*], had driven up from Florida in Romero's wife's Cadillac to visit Romero's relatives in Allentown, Pennsylvania. I asked him where he was staying in Allentown. He said in a house on Fullerton Avenue. I asked him how he came to be in New York that day and he said that he, Romero, and Feridaz [*sic*] had driven in the Cadillac that night from Allentown to Union City, New Jersey to visit some friends of Romero's.
Q. Yes?
A. He said later that evening he and Feridaz [*sic*] decided to drive into New York City so that Romero could show Feridaz [*sic*] Manhattan.

I asked him how come he didn't end up in Manhattan. He said he made a wrong turn coming into the City and ended up in the Bronx instead. He said he exited the Major Degan [*sic*] Expressway at Fordham Road and saw a bar on the street. He said he had never seen the bar before, but he decided to have a drink with Feridaz [*sic*]. When they entered the bar, he said he saw a man name[d] Hugo Marin who he said he only knew as Rolando. He said he had met Rolando, or, Marin, about six months earlier at a restaurant in Miami, Florida which he called Pocasio. He said he had seen him a couple of times in that six month period, that he had no idea that Marin was going to be in that bar. He said that Marin asked him if he could give Marin a ride to 43rd Street in Queens. At that point they left, went outside and got into the Cadillac.
Q. When you said 'they,' did he refer to names?
A. He said Marin, Feridaz [*sic*] and he. He said that Marin then directed him to 43rd Street in Queens where they were stopped."

## II. DISCUSSION

On appeal defendants pursue their contentions that the stop of Romero's automobile violated their Fourth Amendment rights, that the cocaine should have been

suppressed as the fruit of an illegal search, and that the receipt in evidence of Romero's statement in its redacted form unfairly prejudiced each of them.[3] We find no merit in any of their arguments.

## A. The Stop

In general, the Fourth Amendment dictates that an arrest, to be lawful, must be predicated on probable cause. Probable cause exists when a person of reasonable caution would be justified in believing that the individual to be arrested has committed, is committing, or is about to commit a crime. See Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963); Brinegar v. United States, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 161–62, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). In addition, probable cause is necessary when police restrain an individual in a manner that, though not technically an arrest, is nonetheless so intrusive as to be "tantamount" to an arrest. See, e.g., Dunaway v. New York, 442 U.S. 200, 212–16, 99 S.Ct. 2248, 2256–58, 60 L.Ed.2d 824 (1979); United States v. Ceballos, 654 F.2d 177, 182 (2d Cir. 1981); United States v. Vasquez, 638 F.2d 507, 521 (2d Cir. 1980). When, however, police restrain an individual in a manner that falls short of arrest or its functional equivalent, less than probable cause will suffice. In such a situation, the Fourth Amendment imposes the more flexible requirement that the stop be, in all the circumstances, "reasonable," see, e.g., United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), and that it be based on a reasonable and articulable suspicion, e.g., Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 275, 65 L.Ed.2d 890 (1980) (per curiam). The reasonableness of a particular stop depends in turn on the extent of the intrusion on the rights of the individual, and on the reason for the restraint. See United States v. Vasquez, supra, 638 F.2d at 520.

In determining whether a particular restraint is an arrest or tantamount to an arrest, thus requiring probable cause, or instead is a restraint short of an arrest, thus calling for analysis under a reasonableness standard, the degree of restraint must be analyzed. When no formal arrest has been made, several factors must be considered. In particular, courts have considered the amount of force used by the police, the extent of the intrusion, and the extent to which the individual's freedom of movement is restrained. See Dunaway v. New York, supra, 442 U.S. at 212, 99 S.Ct. at 2256; United States v. Ceballos, supra, 654 F.2d at 182–83; United States v. Vasquez, supra, 638 F.2d at 521. In cases involving stops of cars, we have considered the number of police officers and cars used to effect the stop; whether the police blocked the car in motion or otherwise completely impeded its movement, or whether they merely pulled up near it; and whether the police officers had their guns drawn and in view. See United States v. Ceballos, supra, 654 F.2d at 183 n.9; United States v. Jackson, 652 F.2d 244, 249–50 (2d Cir. 1981); United States v. Vasquez, supra, 638 F.2d at 521.

In the present case we have little difficulty in concluding that the initial stop of Romero's car was tantamount to an arrest. Romero's car was stopped by DEA agents, after one of Romero's U-turns on a dead-end street, by means of three or four DEA cars blocking its forward progress, and one DEA car directly behind. There was evidence that the agents rapidly surrounded the Cadillac with their guns drawn, and that at least two of the occupants of the car were physically removed from the car by the agents. Marin, as he was being frisked, tried to walk away and was physically restrained by Agent Papantoniou. Romero would have been no freer to leave; Agent Hanna testified that he would physically have prevented any similar attempt by Romero. Thus, while the defendants were

---

**3.** Defendants also assert that there were certain errors in the charge and in the conduct of the trial. We reject these contentions as well.

not formally placed under arrest until after the cocaine was found in the trunk, we conclude that the initial stop of the car was sufficiently forceful and intrusive that it was tantamount to an arrest. The lawfulness of the arrest therefore depends on whether the agents had probable cause to stop the Cadillac. We conclude that they did.

On the basis of a variety of information from different sources, including the agents' own observations, the agents had compelling grounds at the time of the stop for believing that Marin was engaged in narcotics trafficking. First, the NADDIS computer had reported that Marin was suspected of smuggling narcotics and that he had some connection with Mateus who had been said, by two independent and proven reliable DEA informers, to be selling narcotics from his house. Elilce Mateus had visited Marin, told him that one must be careful of the New York police, and proceeded, on leaving Marin, to drive evasively to, from, back to, and in, Queens. Her visit to Marin was apparently overlapped by a visit by Mateus who told Marin that business was good and indicated that the merchandise should be of high quality. A few days later, Marin's wife said she had purchased a "muestra," a term used by narcotics traffickers to mean a sample of narcotics.

On the day before the arrests, a man, apparently Marin, was overheard mentioning the sum $27,000, and stating that he would deliver two "aparatos," the term "aparato" commonly being used by cocaine dealers to refer to a kilo of cocaine. The next day the Marins went to a meat market and thereafter left a large shoulder bag at the house of Mateus who reportedly sold cocaine from his house. Marin's apparent delivery to Mateus's house was shortly followed by Marin's accompanying Lopez, the driver of the Thunderbird, to another meat market where Lopez picked up a plastic bag which they took to the Bronx, eventually rendez-vousing with Romero, and which eventually Lopez placed in the trunk of Romero's car, with Marin becoming a passenger in Romero's car. The Romero car then proceeded to Queens where it made a number of U-turns and other evasive moves. We conclude that these data and observations would give a reasonably cautious person ample basis for believing that Marin had committed, or was committing, or was about to commit a crime. The agents thus had probable cause to stop the car in which Marin was riding.

B. *The Search of the Car and Bag*

We find no greater merit in defendants' contention that the agents' warrantless search of the Cadillac and of the bag found in its trunk violated their rights under the Fourth Amendment. Although normally a search is deemed unreasonable within the meaning of the Fourth Amendment unless it is conducted pursuant to a warrant issued on probable cause, it is well-settled that an exception exists for searches made following voluntary consent by an individual with authority over the place searched. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Martino*, 664 F.2d 860 (2d Cir. 1981); *United States v. Vasquez, supra*, 638 F.2d at 524; *United States v. Sanchez*, 635 F.2d 47, 58–59 (2d Cir. 1980). A search based on such consent is considered reasonable within the meaning of the Fourth Amendment, even in the absence of a warrant or probable cause. In order to validate a warrantless search, the consent must be " 'freely and voluntarily given.' " *Schneckloth v. Bustamonte, supra*, 412 U.S. at 222, 93 S.Ct. at 2045 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968)); *see also United States v. Martino, supra*, at 874: *United States v. Sanchez, supra*, 635 F.2d at 58. The fact that a person is in official custody does not mean that he is incapable of giving his free and voluntary consent. *United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976). The voluntariness of a consent depends on "the totality of all the circumstances." *Schneckloth v. Bustamonte, supra*, 412 U.S. at 227, 93 S.Ct. at 2047: *United States v. Martino, supra*, at

874: *United States v. Sanchez, supra,* 635 F.2d at 58, and is a question of fact to be resolved by the district court. *Id.*

In the present case the district court ruled that Romero had voluntarily consented to the search of the car, and we find no basis for disturbing that ruling. Romero, although in custody, was not under physical restraint. Agent Papantoniou spoke to him in a conversational tone and was not displaying a weapon. Romero apparently understood English and understood Papantoniou's request to search the car, and he opened the trunk for the agent. There was no evidence suggesting that Romero was threatened, or that his will was overborne, or that his consent was anything other than voluntary. Hence the search of the car was lawful because of Romero's consent.

Insofar as the search of the bag was concerned, the district court did not expressly find that Romero had consented, preferring instead to base his ruling on the lack of any reasonable expectation of privacy in the bag. On the basis of the record in the present case, we uphold this ruling. Although the degree of closure of the bag was not made clear at the hearing[4]—Papantoniou testified that it was not sealed although it may have been folded over at the top—it was clear that Romero had no expectation of privacy in the bag.[5] When asked what was in the bag, Romero revealed its purported contents, stating that it contained clothes; and when Papantoniou asked for permission to look in the bag, Romero gave his permission. These facts, which would support a finding of consent to the search of the bag, equally well support the conclusion that Romero in fact had no expectation of privacy in the bag. The search of the bag was thus lawful.

### C. *The Redacted Statement*

We turn finally to the matter of Romero's redacted statement. We find no merit in Marin's contention that his Sixth Amendment right of confrontation was violated by such portions of the statement as were introduced. The confrontation clause is violated when a statement of a nontestifying codefendant is admitted and is "powerfully incriminating" of or "devastating" to the defendant. *Bruton v. United States, supra,* 391 U.S. at 135, 136, 88 S.Ct. at 1627, 1628. The violation occurs only when the statement is "clearly inculpatory" of the defendant and "vitally important" to the prosecution. *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). *See also United States v. Danzey,* 594 F.2d 905, 917 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979) (dictum). The portions of Romero's statement that were presented to the jury had no such effect. In the only portion of the statement challenged by Marin on appeal, Marin was mentioned only as having asked Romero to drive him to 43rd Street in Queens and having directed him to that area. Marin argues that the statement that he "directed" Romero to 43rd Street implied "that Marin was not merely an unknowing passenger in a vehicle alleged to be carrying contraband but rather an active facilitator of a narcotics transaction who 'had the final say as to the means of transfer.'" (Marin's brief on appeal at 24.) The argument, however, is logically flawed; obviously a passenger in an automobile may give directions

---

4. *See Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981); *United States v. Martino,* 664 F.2d 860 (2d Cir., 1981).

5. Marin apparently has made no effort to show that he had any legitimate expectation of privacy in the bag, relying on *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), for the proposition that since he was charged with possession of the bag he automatically had standing to challenge its seizure and search. (Marin's brief on appeal at 12 n.*.)

The automatic standing rule of *Jones,* however was expressly eliminated by the Supreme Court in *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Since Marin has never asserted any property or possessory interest in the Cadillac or its trunk, or in the bag that was seized, he had no interest in the car or the bag that was protected by the Fourth Amendment *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

to the driver without knowing the contents of the trunk. Romero's statement as redacted and admitted simply did not have the prohibited "powerfully incriminating" or "devastating" effect on Marin.

■ Romero's contention that his statement as admitted should have included his attribution of possession and control of the plastic bag to Marin presents a different issue and a somewhat closer question, but one that we nonetheless decide against him. We conclude that Romero had no right to have this statement admitted into evidence because it was, as offered by Romero, hearsay, and because it was not needed, in fairness, to make complete the portions of his statement that were admitted against him.

Fed.R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In general, hearsay statements are not admissible at trial. Fed.R.Evid. 802. Fed.R.Evid. § 801(d)(2)(A) provides, however, that a party's own statement, if offered against him, is not hearsay.

When the government offers in evidence the post-arrest statement of a defendant it commonly does so for either of two reasons. It may wish to use the statement to establish the truth of the matter stated. In these circumstances, under Rule 801(d)(2)(A) the statement is not hearsay, because it is simply a statement of the opposing party. On the other hand, the government may wish to offer the statement to show that the defendant made false representations to the authorities, from which the jury could infer a consciousness of guilt, and hence guilt. In these circumstances the statement obviously is not offered for the truth of the matter asserted, and therefore is non-hearsay under Rule 801(c), as well as non-hearsay under Rule 801(d)(2)(A) as the statement of an opposing party. Regardless of which purpose the government had in offering the

defendant's statement, the statement as thus offered is not hearsay.

■ When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible. When the defendant offers his own statement simply to show that it was made, rather than to establish the truth of the matter asserted, the fact that the statement was made must be relevant to the issues in the lawsuit. In the present case, Romero's prior statement that Marin put the bag into Romero's car was hearsay if offered to prove that fact, and was irrelevant if offered simply to prove that Romero had made such an allegation.

■ Romero argues, however, that the "doctrine of completeness," as reflected in Fed.R.Evid. 106, required the court to admit that portion of his statement that attributed possession of the bag to Marin. Rule 106 provides as follows:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

We have interpreted this Rule to require that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact, see United States v. Rubin, 609 F.2d 51, 63 (2d Cir. 1979), aff'd, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); United States v. Mulligan, 573 F.2d 775, 778 (2d Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978); see also United States v. Jamar, 561 F.2d 1103 (2d Cir. 1977); Fed.R.Evid. § 106, Advisory Committee's Note, or to ensure a "fair and impartial understanding" of the admitted portion, United States v. Capaldo, 402 F.2d 821, 824 (2d Cir. 1968), cert. denied, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969). The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages. See,

*e.g., United States v. McCorkle,* 511 F.2d 482 (7th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975).[6]

In the present case, the completeness doctrine did not require admission of Romero's entire statement. The redacted statement, in omitting Romero's assertion that Marin put the bag in the trunk of the Cadillac, omitted all reference to the bag. Thus, the statement as redacted concerned only the circumstances surrounding the meeting of Romero, Marin, and Farradaz in the Bronx, and their trip to Queens. The placement of the bag in the trunk of Romero's car was an entirely different matter and thus was neither relevant to the rest of the statement nor necessary to explain or place in context the admitted portion.

Nor did the omission prevent a "fair and impartial understanding" of the statement, or render it misleading. Although in theory the omission could have created the false impression that the bag had been in Romero's car all along, and thus belonged to him, in the circumstances of this case no such danger was present. DEA Agents Hanna and Papantoniou testified at trial that in fact the bag had been placed in Romero's car by Lopez, the driver of the Thunderbird. There was thus no danger that Romero's redacted statement would lead the jury to believe that the bag had been put in the car by Romero himself.

## CONCLUSION

The judgments are affirmed.

**6.** This is especially true where, as here, the statement was offered as a false exculpatory assertion. The consideration may become somewhat more complex when the defendant's statement is offered to prove the truth of the matter asserted. Thus, when the government offers in evidence a defendant's confession and in confessing the defendant has also made exculpatory statements that the government seeks to omit, the defendant's Fifth Amendment rights may be implicated. In such circumstances the Seventh Circuit has stated that the Fifth Amendment right to remain silent is violated when the omission "paint[s] a distorted picture ... which [the defendant is] powerless to remedy without taking the stand." *Unit-*

*ed States v. Walker, supra,* 652 F.2d at 713, and results in "substantial" prejudice to the defendant. *Id.* at 714. *See Burns v. Beto,* 371 F.2d 598, 602 (5th Cir. 1966) (dictum); 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 106[01], at 106–6—106–9 (1975); C. Wright & K. Graham, *Federal Practice & Procedure* § 5077, at 370 (1977).

Our Court has not previously considered this question and we have no occasion to do so now. In the circumstances here, where Agents Hanna and Papantoniou testified that Lopez had put the bag into Romero's car, the exclusion of Romero's statement that Marin had put the bag there did not leave the distorted impression that Romero himself had put it there.