35 F.3d 574
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Herman GRAULICH, Defendant-Appellant.
 No. 93-1061.
 United States Court of Appeals, Tenth Circuit.
 Sept. 13, 1994.
 
 Before BALDOCK, BARRETT and BRORBY, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 Herman Graulich (Graulich) appeals from the judgment and sentence imposed following a jury trial. He was found guilty of one count of aiding and abetting securities fraud (18 U.S.C. 2 and 15 U.S.C. 78j(b) and 78(ff)), two counts of aiding and abetting mail fraud (18 U.S.C. 2 and 1341), and one count of aiding and abetting wire fraud (18 U.S.C. 2 and 1343). He was sentenced to 14 months imprisonment, three years of supervised release, and fined $10,000 with a special assessment of $200.
 
 
 2
 During late 1988 and early 1989, the Federal Bureau of Investigation (FBI) and the Securities and Exchange Commission (SEC) developed a "sting" operation in Denver, Colorado, in an attempt to curb the growing fraud in the Rocky Mountain area penny stock market. The FBI created Monarch Investment Services and FBI Agent John Coffey posed as "John O'Kelly," Monarch's president. O'Kelly let it be known that he was in the market for a "boxed" public company.
 
 
 3
 Boxed companies are lawfully registered shell corporations with little or no value which are controlled by an individual or small group of individuals who artificially manipulate the purchase and sale of the stock. Once the manipulators have received their profits by selling the worthless stock to the unsuspecting public, the value of the stock crashes to zero.
 
 
 4
 From January through March, 1989, Anthony Cavanaugh, a convicted felon, FBI informant, and known entity in the Denver penny stock market, introduced O'Kelly to various people, including codefendant Steven Sneed. Sneed related that he could find a shell corporation and that he would help O'Kelly recruit stockbrokers and market-makers to assist with the scheme.
 
 
 5
 In April, 1989, Sneed introduced O'Kelly to codefendant Brent Gundersen whom Sneed had learned about through Graulich. Gundersen agreed to provide a company for the scheme and to back-date and falsify various documents necessary for obtaining an attorney's tradeability letter indicating that the company's stock could be freely and publicly traded. Gundersen's fee for providing the company and related services was $40,000.00, payable in several installments.
 
 
 6
 Gundersen produced 100% of the stock of Androids, a defunct company. Androids's name was later changed to Monarch Acquisitions, Inc. (Monarch). Sneed and Gundersen recruited Graulich to arrange for the market-makers and to orchestrate the prearranged trades in Monarch stock. Graulich negotiated a fee of $10,000.00 for his services. (R., Vol. 51, p. 223).
 
 
 7
 During the summer of 1989, Sneed and Graulich recruited market-makers and cooperating brokers to trade Monarch's stock. Graulich opened a nominee account for "Michael Moss," an assumed name for an FBI special agent and he also arranged for Kashner Davidson Securities Corp., Sarasota, Florida, to act as a market-maker. Graulich reviewed the trading schedule for the stock, recommended several changes to the schedule, and suggested the use of cashier's checks in the nominee's names to make tracing the money more difficult.
 
 
 8
 On October 10, 1989, Sneed joined O'Kelly at the Monarch office where Sneed directed trading in Monarch's stock. Graulich and codefendant Sam Pandolfo made the first trade. The trading continued over three trading days during which the price of Monarch stock rose from five cents to twelve cents a share. On October 13, 1989, the SEC, by prior arrangement, suspended trading in Monarch stock. In subsequent telephone conversations, Gundersen and Graulich encouraged O'Kelly not to worry and assured him that they should be able to resume trading shortly.
 
 
 9
 Graulich was charged in a nine count indictment with nine codefendants. Graulich's motion for severance was denied and he was tried with codefendants Sneed, Gundersen, and Pandolfo. Graulich defended on the basis that: O'Kelly had violated FBI policy by failing to disclose during their first two meetings that the plan was illegal; there was no evidence at trial that he was involved in criminal activity of any kind prior to his initial contact with O'Kelly; O'Kelly had related that he was a financial planner and that he was going to put together a package of real estate assets that would become the assets of Monarch.
 
 
 10
 On appeal, Graulich contends that the court erred in: denying his motion to dismiss the indictment for outrageous governmental conduct; denying his motion for a severance; granting the government's peremptory challenge of Juror Low; allowing the government to play only portions of its tapes and in allowing the tapes to go into the jury room during deliberations; and in sentencing him by, finding that he was a manager and supervisor, failing to rule under the aberrant behavior reduction, departing upward under the Sentencing Guidelines, and imposing a fine.
 
 I.
 
 11
 Graulich contends that the court erred in denying his motion to dismiss the indictment for outrageous governmental conduct. Both Graulich and the government cite United States v. Mosley, 965 F.2d 906 (10th Cir.1992), in which we observed that "[a]lthough the requirement of outrageousness has been stated in several different ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable." 965 F.2d at 910.
 
 
 12
 In Mosely we addressed the question of whether conduct by the Wyoming Division of Criminal Investigation (DCI) was so outrageous as to violate the defendant's due process rights and thus bar prosecution. There the DCI, upon receiving complaints of drug trafficking from citizens in Wheatland, Wyoming, assigned Special Agent Mike Arter to conduct an undercover investigation in the area. As part of the investigation, Arter frequented the Commodore Bar in Wheatland posing as a high-stakes drug dealer in an attempt to draw the attention of anyone involved in drug trafficking in the area.
 
 
 13
 Three months into the investigation, defendant Mosley approached Arter and inquired if Arter could sell him some marijuana. Arter subsequently told Mosley that he could not sell him any marijuana. Instead, Arter suggested that he could sell Mosley a pound of cocaine for a "good price" of $10,000. When Mosley indicated a desire to purchase a smaller quantity, Arter agreed to sell him four ounces of cocaine for $3,200 and four ounces on credit.
 
 
 14
 On appeal, we rejected Mosley's contentions that the government's conduct was outrageous because the government essentially created the crimes for which he was prosecuted and because several acts by Arter had effectively coerced him into participating in those crimes. We held that the outrageous governmental conduct defense "is an extraordinary defense reserved for the most egregious circumstances," 965 F.2d at 910, and that "[i]t is not to be invoked each time the government acts deceptively or participates in a crime it is investigating." Id. We also observed that "two factors ... form the underpinnings for most cases where the outrageous conduct defense has been upheld: government creation of the crime and substantial coercion.". Id. at 911.
 
 
 15
 Graulich argues that the evidence at trial revealed that the government created "the phoney business and then went out to recruit people to become involved in the illegal FBI scheme." (Opening Brief of Defendant-Appellant at 11). Graulich also maintains that "[t]here was no evidence that he was committing any criminal act prior to the contact initiated by the FBI. In fact, just the opposite was true," id, and that "[i]t is undisputed that [he] was not committing crime prior to being targeted by the FBI. He was minding his own business" Id. at 13. He concludes that "but for the government's overzealous pursuit to nab some people in the penny stock market who might be committing crimes, [he] would not now be serving time in a Federal prison." Id. at 14.
 
 
 16
 The government responds that undercover investigations, including "stings," are a recognized and legitimate law enforcement technique, even when the government, in its undercover capacity, plays a substantial role in the criminal activity. The government points out that it established Monarch Investment Services to uncover ongoing criminal behavior; the defendants were predisposed and inclined to participate in the illegal activity; "Graulich was a licensed securities professional who displayed a 'take charge' attitude in carrying out the Monarch scheme," (Appellee's Brief at 32); and "[l]ike the others, Graulich's voluntary criminal acts were based on simple greed--in seeking a $10,000 fee to manipulate a worthless stock--and were knowingly calculated to ensure the scheme's success and concealment." Id.
 
 
 17
 Applying Mosley to the facts herein, we hold that the district court did not err in denying Graulich's motion to dismiss based on outrageous governmental conduct. The government did not create the crime and did not coerce Graulich into participating in the crime. Rather, the record establishes that the FBI set up Monarch only after it became aware of the fraud and abuses occurring in the Rocky Mountain area penny stock market. Its investigation was designed to uncover ongoing criminal behavior and not, as Graulich contends, to create or manufacture a new crime. The record shows that Graulich embraced the opportunity to participate in the scheme and that he was not induced or coerced. Under these circumstances, the government's conduct was not "shocking, outrageous, and clearly intolerable." Mosley, 965 F.2d at 910.
 
 II.
 
 18
 Graulich asserts that the court erred by denying his motion for severance.
 
 
 19
 Graulich was charged in a nine count indictment with nine codefendants, including codefendants Pandolfo and General Bond and Share. Pandolfo and General Bond and Share moved to sever and their motions were set for hearing. On the morning of the hearing, the court allowed Graulich to join in their motions. During the hearing, Pandolfo argued that codefendants Sneed and Gundersen would provide exculpatory testimony at a separate trial. Graulich joined in Pandolfo's motion but did not argue that Sneed and Gundersen would provide exculpatory testimony at a separate trial. The court denied the motions.
 
 
 20
 Graulich contends that the court abused its discretion in denying his motion because codefendants Sneed and Gundersen could have testified at a separate trial and their testimony would have been exculpatory and favorable to him. The government responds that: there is no evidence to support Graulich's suggestion that Gundersen and Sneed would have provided exculpatory testimony on his behalf if the court had allowed a severance; Graulich did not file his own motion for severance; rather, he adopted codefendant Pandolfo's motion; and, Graulich did not present any separate evidence supportive of his motion for severance. Under United States v. Martin, 18 F.3d 1515, 1519 (10th Cir.1994), United States v. Cox, 934 F.2d 1114, 1119-20 (10th Cir.1991), and United States v. Valentine, 706 F.2d 282, 291 (10th Cir.1983), we held that no need for a severance exists until the defendant makes a convincing showing of real prejudice from joinder.
 
 
 21
 Separate trials are not a matter of right where two or more defendants allegedly participated in the same act or transaction or the same series of acts or transactions that constitute a criminal offense. United States v. Davis, 436 F.2d 679, 681 (10th Cir.1971). The decision of whether to grant or deny severance is within the trial court's discretion and its decision will not be disturbed on appeal absent an affirmative showing of an abuse of discretion. United States v. Cardall, 885 F.2d 656, 667 (10th Cir.1989). Importantly,
 
 
 22
 [a] severance should be granted by the district court 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' Zafiro v. United States, --- U.S. ----, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In order to obtain a separate trial, the defendant must make a strong showing of prejudice.... This burden is heavy for the defendant to bear as he must show more than a better chance of acquittal or a hypothesis of prejudice ... he must, in fact, show real prejudice.
 
 
 23
 United States v. Youngpeter, 986 F.2d 349, 353 (10th Cir.1993).
 
 
 24
 Graulich did not present any separate evidence in support of his motion for severance and he failed to show real prejudice.
 
 III.
 
 25
 Graulich asserts that the court erred in granting the government's peremptory challenge of a juror, Ms. Low, an Asian-American. Graulich argues that Ms. Low was improperly excluded by the government solely on the basis on her race.
 
 
 26
 During jury selection, Ms. Low was called to the jury box for voir dire. At a sidebar conference, Ms. Low stated that her husband had a felony conviction before their marriage but that she would rather not divulge it. The prosecution then exercised a peremptory challenge and Ms. Low was excused. After Ms. Low had left the court room and another prospective juror had been questioned, codefendant Gundersen objected to the government's peremptory challenge of Ms. Low under Batson v. Kentucky, 476 U.S. 79, 89 (1986) (Equal protection clause forbids the prosecutor to challenge potential jurors solely on account of their race).
 
 
 27
 Upon questioning by the court, the prosecutor stated that the main reasons for the peremptory challenge were that Ms. Low's husband was the person charged, the charge itself, and the fact that Ms. Low had asked to approach the bench and had a problem with discussing the felony charge openly. Attempts to relocate Ms. Low quickly enough to prevent a delay in the trial failed. Following a recess, the court conferred with counsel relative to the issue of Ms. Low's peremptory challenge. During the conference, the prosecutor continued to support the challenge because of Ms. Low's husband's prior felony. The prosecutor also related that his intuition told him that Ms. Low would be more sympathetic towards the defense because she worked in the counseling field and lived in Boulder, Colorado, a liberal community.
 
 
 28
 At the conclusion of the conference the court found that the defendants had not met their burden of proving that the prosecution had intentionally challenged Ms. Low on the basis of race or that there was a pattern of discrimination. The court also found that the prosecutor's explanation was adequate and in good faith and that his exercise of the peremptory challenge was reasonable under the circumstances.
 
 
 29
 We review challenges to the improper striking of prospective jurors based on their race de novo, giving deference to the trial court's first-hand observations of the circumstances of each case. United States v. Hartsfield, 976 F.2d 1349, 1355-56 (10th Cir.1992), cert. denied, --- U.S. ---- (1993). To successfully challenge the government's peremptory strike of a venire member, a defendant must first establish a prima facie case of purposeful discrimination. United States v. Joe, 8 F.3d 1488, 1498 (10th Cir.1993), cert. denied, --- U.S. ---- (1994). Once a defendant makes a prima facie showing, the burden shifts to the government to come forward with a neutral explanation. Id. A race neutral explanation is one that is based upon some reason other than the race of the venireperson. Hernandez v. New York, 111 S.Ct. 1859, 1866. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Id.
 
 
 30
 Applying these standards, we hold that the district court did not err in granting the government's peremptory challenge of Ms. Low. The preliminary issue of whether Graulich made a prima facie showing of discrimination became moot after the prosecutor explained that he had exercised a peremptory challenge to exclude Ms. Low because of her husband's prior felony and his intuition that she would be more sympathetic and after the district court ruled on that explanation. The prosecutor's explanation was race neutral and the record supports the district court's findings that the prosecutor's explanation was in good faith and that his exercise of the peremptory challenge was reasonable under the circumstances.
 
 IV.
 
 31
 a.
 
 
 32
 Graulich contends that the court erred in allowing the government to play only portions of O'Kelly's taped-recorded conversations with the defendants.
 
 
 33
 Prior to trial, the government indicated that it would be offering excerpts of O'Kelly's tape-recorded conversations with the defendants during trial as coconspirator statements. In accordance therewith, the government sent the defendants excerpts of O'Kelly's tape-recorded conversations. In response, Graulich expressed concern about using redacted recordings and requested that the government play each tape in its entirety.
 
 
 34
 During trial, the court ruled on the admissibility of the tapes on a tape-by-tape basis as to whether or not the entire tape or an excerpt would be played. The court allowed the defendants to play the redacted portions of the tape-recordings if they first established the exculpatory nature of the redacted portions or established that it was otherwise necessary for the jury to hear the redacted portions. The court also allowed defense counsel the opportunity to cross-examine using the full transcript of the taped conversations, in which case the jury was also provided a full copy of the transcript.
 
 
 35
 Graulich maintains that this procedure was inadequate and that the court erred by allowing the government to play the redacted tape-recordings. Graulich argues that the procedure followed by the court "prevent[ed] the jury from hearing the voice inflection, the phrasing, tenor of the actual voices on portions of the tapes. This was error. To prevent the jury from hearing the entire tape was misleading." (Opening Brief of Defendant-Appellant at 35). Graulich acknowledges that he did not make an offer of proof.
 
 
 36
 Rule 106, Federal Rule of Evidence, provides that "[w]hen a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Under the doctrine of completeness embodied in Rule 106, another writing or tape recording is required to be read or heard if it is necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the trier of fact, or to insure a fair and impartial understanding. United States v. Sweiss, 814 F.2d 1208, 1211-12 (7th Cir.1987). In United States v. Wright, 826 F.2d 938, 946 (10th Cir.1987), we reasoned:
 
 
 37
 Morgan also complains that he was not allowed to introduce several portions of the diary. Many of the portions of the diary that Morgan sought to admit were ruled admissible by the trial judge. The portions ruled inadmissible were not demonstrably relevant to the issues at trial. Under the doctrine of completeness embodied in Fed.R.Evid. 106, it is not required that portions of a writing which are neither explanatory of the previously introduced portions nor relevant to the introduced portions [be] admitted. United States v. Marin, 669 F.2d 73 (2nd Cir.1982). It would be puerile to suggest that if any part of an statement is to be admitted the entire statement must be admitted.
 
 
 38
 Here the court determined the proffered portions were not sufficiently relevant to the issues at trial or to previously admitted sections of the diary to warrant admission. Such decisions are properly left to the trial judge. We hold that he did not abuse his discretion in refusing to admit portions of the diary proffered by appellant Morgan.
 
 
 39
 Graulich's basic complaint, i.e., that each tape had to be played in its entirety, is without merit. The court allowed the defendants to play the redacted portions of the tape-recordings if they established the exculpatory nature of the redacted portions or established that it was otherwise necessary for the jury to hear the redacted portions. The court also allowed defense counsel the opportunity to cross-examine using the full transcript of the taped conversations, in which case the jury was also provided a full copy of the transcript. Significantly, Graulich did not make an offer of proof. Under these circumstances, the district court did not abuse its discretion in refusing to play each tape in its entirety.
 
 
 40
 b.
 
 
 41
 Graulich argues that the court erred in allowing the tapes to go to the jury during deliberations because it gave undue emphasis to a portion of the evidence which prejudiced him. Graulich argues that application of the plain error standard requires reversal.
 
 
 42
 The government responds that Graulich's argument is inconsistent with the well-settled principle that properly admitted exhibits are ordinarily allowed to go to the jury room under the court's discretion. The government observes that the tapes were only part of the evidence submitted, which also included documents, and that the court did not abuse its discretion in allowing the tapes to go to the jury room during deliberations. We agree.
 
 
 43
 A trial court may send all or part of the exhibits admitted into evidence to the jury before or after it has begun its deliberations. United States v. De Hernandez, 745 F.2d 1305, 1308 (10th Cir.1984). In United States v. Hofer, 995 F.2d 746, 748 (7th Cir.1993), the court held that there was no abuse of discretion in allowing taped conversations to go to the jury during deliberations despite defendant's contention that the tapes were the linchpin of the government's case. See also United States v. Welch, 945 F.2d 1378, 1383 (7th Cir.1991), cert. denied, --- U.S. ---- (1992) (jury is allowed with court approval to have properly authenticated tapes played during its deliberations).
 
 
 44
 We hold that the tapes were properly admitted in evidence and that the district court did not abuse its discretion in thereafter allowing the tapes to go to the jury room during deliberations.
 
 V.
 
 45
 Graulich contends that the court erred in sentencing him by: finding that he was a manager and supervisor; failing to rule under the aberrant behavior reduction; departing upward; and imposing a fine.
 
 
 46
 A district court's factual findings made at sentencing are reviewed under a clearly erroneous standard while its legal interpretation of the guidelines is reviewed de novo. United States v. Lambert, 995 F.2d 1006, 1008 (10th Cir.1993), cert. denied, --- U.S. ---- (1993).
 
 
 47
 a.
 
 
 48
 Graulich asserts that the court erred in finding that he was a manager or supervisor. We disagree.
 
 
 49
 In sentencing Graulich, the district court found:
 
 
 50
 All things considered, I find that he [Graulich] merits the same intermediate "manager or supervisor" adjustment meted out to Mr. Gundersen.
 
 
 51
 Like Mr. Gundersen, Mr. Graulich knew that the general object of the manipulation was to use the stock to secure a bank loan. His claim to a share of the proceeds was significantly less than Mr. Gundersen's, 10,000 as opposed to 40,000, and unlike the case of Mr. Gundersen, there was no single criminal actor who reported directly to him as the boss in a chain of command.
 
 
 52
 Unlike Mr. Gundersen, however, Mr. Graulich was at the heart of the manipulation scheme and exhibited considerable sophistication, notwithstanding his counsel's reference to aberrant behavior, on the question of how to control trading of the stock so as to minimize the possibility of detection. That really was Mr. Graulich's specialty, it seems to me, is that he knew how to do this to minimize detection. He revised and refined Mr. Sneed's trading schedule. He directed the market makers during the manipulations. He spoke to one of the nominee sellers, the one who was really the undercover agent, concerning how to conduct himself if there was any investigation.... In the control of the actual manipulation then, even though he wasn't anybody's direct boss, his activity was second only to Sneed's.
 
 
 53
 (R., Vol. 51 at 209-10).
 
 
 54
 Graulich does not challenge the court's specific findings that he "was a the heart of the manipulation scheme" and that he "directed the market makers during the manipulations." The record supports this finding. It is not clearly erroneous.
 
 
 55
 b.
 
 
 56
 Graulich contends that the court erred by failing to rule on the aberrant behavior doctrine at sentencing. Graulich argues that since his agreement was that he would receive a $10,000 finders fee for finding market makers and would not benefit from any increase in the price of the stock or from the bank loan, and since the court could find that the lack of benefit from a criminal act was a mitigating circumstance, the trial court erred in not ruling on the aberrant behavior doctrine. The government responds, citing United States v. Soto, 918 F.2d 882, 883-84 (10th Cir.1990), that 18 U.S.C. 3742 "does not grant appellate jurisdiction over a trial court's discretionary refusal to depart downward from the [sentencing] guidelines" unless the district court "erroneously believe[d] the guidelines do not permit a downward departure." We agree.
 
 
 57
 Here it is clear that the district court did consider whether the doctrine of aberrant behavior applied. The court rejected it based on its finding that "Mr. Graulich was at the heart of the manipulation scheme and exhibited considerable sophistication, not withstanding his counsel's reference to aberrant behavior." (R., Vol. 51 at 209). Under these circumstances, the district court's refusal to depart downward on the basis of aberrant behavior is not reviewable. United States v. Sanders, 18 F.3d 1488, 1490 (10th Cir.1994).
 
 
 58
 c.
 
 
 59
 Graulich asserts that the district court erred in its upward departure from the guidelines.
 
 
 60
 Graulich states that the court erred when, after finding that there was no actual loss and no probable loss because of the nature of the FBI "sting" operation, it nevertheless departed upward based on its finding that the actual amount of the loss did not reflect the harmfulness and seriousness of the conduct. Graulich further contends that the court failed to point out what aggravating circumstances were not taken into consideration by the guidelines.
 
 
 61
 The government responds that although the district court determined that the correct loss in an undercover "sting" operation is zero, the court could have, and should have, enhanced the defendant's sentences based on intended loss, citing U.S.S.G. 2F1.1, comment (n. 7) (In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss). The government also argues that the guidelines allow for an upward departure in cases such as this where the loss determined does not fully capture the harmfulness and seriousness of the conduct.
 
 
 62
 We review the district court's upward departure in three steps:
 
 
 63
 First, we determine whether the circumstances cited by the district court warrant a departure from the guidelines as a matter of law.... Second, we review the court's factual determinations underlying the asserted justifications for departure to determine if they are supported by the record.... Third, we determine whether the degree of departure is reasonable.
 
 
 64
 United States v. Tisdale, 7 F.3d 957, 961 (10th Cir.1993), cert. denied, --- U.S. ---- (1994).
 
 
 65
 In our case, the district court relied on U.S.S.G. 2F1.1 comment (n. 9) to depart upward. ("Dollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted.") (R., Vol. 51 at 220). The court found that the upward departure was warranted "to take into account the obvious differences in culpability from--between a teller who steals $500.00 or embezzles $500.00 from the cash drawer on one occasion and the conduct that these defendants stand convicted of." Id. at 221. Thereafter, the court departed upward "to a base level which reflects a loss figure based on the anticipated gain which each defendant negotiated for himself." Id. at 224. Following the upward departure, Graulich's offense level went from 9 to 11, and his imprisonment range went from 4 months to 10 months to 8 months to 14 months.
 
 
 66
 We hold that the court did not err in departing upward in sentencing Graulich and that the degree of departure was reasonable based on the "intricate [and] carefully executed scheme," (R., Vol. 51 at 221), and the "anticipated gain which each defendant negotiated for himself." Id. at 224.
 
 
 67
 d.
 
 
 68
 Graulich contends that the trial court erred in assessing him a fine of $10,000.00.
 
 
 69
 Graulich was sentenced on December 18, 1992. His presentence investigation report reflected adjusted gross income for tax years 1987 through 1991 of $39,889, $32,040, $40,860, $30,617, and $30,191, respectively, and $1,076 in unpaid debts that were current or had gone to collection. The report also included the statement that "[u]naccounted for in defendant's bleak financial picture are $6,642.00 in taxable interest income as reflected in defendant's jointly filed 1991 income tax return." (R., Vol. 56 at 19).
 
 
 70
 During the sentencing hearing, the court ordered that Graulich "pay a fine of $10,000.00 either in a lump sum of in installments of at least $300.00 per month," (R., Vol. 51 at 232), payable after Graulich was on supervised release. In assessing the fine the court found that "[i]n your case, I do believe that the combination of assets and earning ability will permit you to pay that fine." Id.
 
 
 71
 Graulich argues that because he was found to be indigent and because the presentence report, which the court adopted, recommended that no fine be imposed, the court's finding that the combination of his assets and earning ability would allow him to pay the fine was error.
 
 
 72
 The government responds that inasmuch as Graulich did not object to the fine imposed at sentencing, we review the district court's imposition of the fine for plain error only. United States v. Burson, 952 F.2d 1196, 1202 (10th Cir.1991), cert. denied, --- U.S. ---- (1992). We agree.
 
 
 73
 U.S.S.G. 5E1.2 mandates a fine "except where the defendant establishes that he is unable to pay and is not likely to become able to pay the fine." "[S]atisfactory compliance with 5E1.2 merely requires that the record reflect the district court's consideration of the pertinent factors prior to imposing the fine." United States v. Washington-Williams, 945 F.2d 325, 328 (10th Cir.1991). We hold that the record demonstrates that the court complied with 5E1.2. The imposition of the fine did not constitute plain error.
 
 
 74
 AFFIRMED.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470