UNITED STATES of America, Appellee,

v.

The SOUTHLAND CORPORATION and S. Richmond Dole and Eugene Mastropieri, Defendants,

The Southland Corporation, Eugene Mastropieri, Defendant-Appellants.

Nos. 479, 534, Dockets 84–1284, 84–1307.

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1985.

Decided April 23, 1985.

Gerald L. Shargel, New York City, for defendant-appellant Eugene Mastropieri.

Peter Bleakley, Washington, D.C. (William J. Baer, Robert N. Weiner, Edward L. Wolf, Arnold & Porter, Washington, D.C.), for defendant-appellant The Southland Corporation.

Gregory Wallance, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond Dearie, U.S. Atty., E.D.N.Y. and Jane Simkin Smith, Asst. U.S. Atty.), Brooklyn, N.Y., for appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and MANSFIELD, Circuit Judges.

FRIENDLY, Circuit Judge:

The Southland Corporation, a large retailer with headquarters in Dallas, Texas, and Eugene Mastropieri, a lawyer in the borough of Queens who was a member of the New York City Council, appeal from judgments of conviction, rendered after trial before Judge Sifton and a jury in the District Court for the Eastern District of New York.[1] The convictions were rendered on a single count superseding indictment, charging a conspiracy in violation of 18 U.S.C. § 371, having two objectives as set forth below. Mastropieri was sentenced to 18 months in prison and Southland to a fine of $10,000.

The indictment began by alleging that there were pending before the Department of Taxation and Finance of the State of New York various cases which concerned Southland's liability for sales taxes due and owing upon the sale of merchandise through 7-Eleven stores franchised by Southland and for other reasons. It proceeded to allege that defendants conspired to travel in foreign and interstate commerce and use facilities in interstate commerce with intent to bribe state officials in violation of Article 200 of the Penal Law of the State of New York in relation to such taxes and had also conspired to defraud the United States by impeding the function of the Internal Revenue Service in determining the true nature of Southland's business expenses by causing amounts intended to be paid as bribes to such officials to appear on Southland's corporation tax return as legal fees to Mastropieri. Various steps in the conspiracy were alleged in further detail. The last overt act relating to the Travel Act objective occurred on March 27, 1978; the last overt act relating to the fraud on the United States occurred on November 24, 1980. Pursuant to a special verdict Mastropieri was found guilty of conspiring to achieve both objectives; Southland was found guilty of conspiring only with respect to the tax fraud objective.

DISCUSSION

## I. *Sufficiency of the Evidence*

The jury could reasonably have found the facts to be as follows: Some of Southland's 7-Eleven convenience stores in New York were owned by the corporation; some were franchised. In 1977 Vice President S. Richmond Dole was headquarters executive in charge of all Southland franchise stores. The stores were divided into regions, each with its own manager. In 1977 the Northern Region Manager was Frank Kitchen. A part of that region, the Northeast Division, which included New York State, was managed by Eugene DeFalco, the Government's principal witness. In 1973 the New York Department of Taxation and Finance began proceedings against 7-Eleven franchise store operators and against Southland itself involving potential liability in excess of $1,000,000, on a legal theory which was by no means implausible. This was a considerable sum for the Northeast Division, which had had only one profitable year in its history. Also, because of bonus arrangements, DeFalco had a direct stake in the Northeast Division's earnings.

In January, 1977, DeFalco was introduced by a corporate security consultant, John Kelly, to defendant Mastropieri, a New York City councilman from Queens. DeFalco reviewed the history of Southland's problems with the Tax Commission. Mastropieri said that he knew a number of people in the sales tax bureau, including the chairman of the Tax Commission, James Tully, that "he could be of service" to DeFalco and that he would later be able to estimate the cost. DeFalco reported the meeting to Dole and to Clark J. Matthews II, Southland's general counsel. In a meeting a week later DeFalco told Mastropieri that he anticipated testifying before a judge in a formal proceeding relating to the tax dispute. Mastropieri interjected that sales tax cases were decided without formal hearings by tax commissioners who

1. The jury was unable to reach a verdict with respect to a third defendant, S. Richmond Dole, who was a Vice President of Southland.

were political appointees and their aides who were professionals, and that he was very friendly with both. He explained that it would not be uncommon for the aides to mark the commissioners' agendas at the time of the hearing with indications how they should vote. After repeating that he had worked with a number of these people, Mastropieri said with a smile, "This may require heavy entertainment;" DeFalco answered "that was possible, we had entertained people before." DeFalco wanted to know what the entertainment would cost but Mastropieri deferred such inquiries.

DeFalco immediately reported to Dole that he and Mastropieri had discussed the case further, and that Mastropieri had told him "in very broad terms who he was going to work with in Albany, the bureaucrats and Mr. [Tully]." DeFalco gave it to Dole as his opinion, based on the dinner conversation, that Mastropieri "was going to be paying somebody off." Dole said, "handle it or can you handle it and take care of it."

Kelly, Mastropieri and DeFalco then sought to come up with suitable financial arrangements. Mastropieri called for $45,000 in cash, of which he was to receive $25,000 "for an up front payment or retainer" and "$20,000 was to be for the expenses that [DeFalco] and he discussed." Dole advised DeFalco that it would be impossible to generate such a large sum in cash within the corporation. A second proposal was to enter into a phony airplane lease arrangement with a friend of Kelly; this ran into difficulties too numerous to be stated. Finally it was proposed that Mastropieri submit a legal bill for $96,500. Since this sum would have to come from the headquarter's accounts, this proposal was discussed, after a large sales meeting for the Northeast Division at the Hilton Hotel at Hartford, Connecticut, in the suite of John P. Thompson, Southland's CEO. The latter inquired about Mastropieri's fee.

DeFalco explained it would be in the "90 to $100,000 range" and would include "entertainment." At the mention of this word Dole and DeFalco chuckled. When Kitchen complained in the hotel corridor as to what was going on, DeFalco gestured to Dole to handle him.

Shortly after the Hartford meeting Dole informed DeFalco that the Mastropieri fee would be paid from a corporate legal accrual account and how the bill should read. On July 7, 1977, Dole left with Eugene Pender, Southland's Controller, an undated bill reading as follows:

EUGENE F. MASTROPIERI
Attorney At Law
67–40 Myrtle Avenue
Glendale, New York 11227

VAndyke 1–2210–1
VAndyke 1–3612–3

Mr. Eugene A. DeFalco
c/o The Southland Corporation
425 Cherry Street
Bedford Hills, New York 10507

FOR PROFESSIONAL SERVICES RENDERED

Balance Due    October 1976 thru May 1977    $96,500.00

Dole asked that payment be expedited; when Pender asked why, Dole told him not to pursue that question any further. On the same day a check for $96,500 was made payable to Mastropieri and mailed to DeFalco. Southland took the entire $96,500 as a deductible business expense on its 1977 corporate income tax return. At the same time Southland sent an IRS Form 1099 to Mastropieri informing him that $96,500 was being reported to the IRS as a professional fee.

DeFalco sent the $96,500 check to Kelly with the note reproduced in the margin.[2] Kelly arranged to have Mastropieri call at his home on Sunday, July 17, 1977. Mastropieri brought with him a signed blank check on his firm's escrow account. Kelly handed him the Southland check, which

---

**2.** "25 GM
10 GM (Re invoice/your baby)
13 JK (service fee)
48.5 Back in cash ASAP"

Mastropieri would subsequently deposit in the escrow account. Kelly made the escrow account check payable to himself in the amount of $96,500 and later caused it to be deposited in his account at the Bank of Montreal in Toronto. DeFalco established an account in the same bank into which $20,000 was deposited by intra-bank transfer to serve as a bribery slush fund. By way of numerous checks and wire transfers, an additional $28,500 was siphoned off by DeFalco for his personal use. The $48,000 that remained in Kelly's account was earmarked as Mastropieri's compensation and to cover Kelly's additional tax liability.

Mastropieri had had an inconclusive conference on April 22, 1977 with the state tax officials. In late 1977 Mastropieri asked DeFalco to prepare a draft opinion which the Tax Commission could adopt. DeFalco obliged with an opinion that stated that "[t]here is clear and convincing testimony on the part of Southland to the effect that in no case did it purchase the inventory ... by repossession," when in fact there was no testimony of any sort, and that "the transfer of the merchandise inventory by the former owners to The Southland Corporation constitutes a transfer in settlement or realization of security interests which are excepted from the general requirements of Article Six of the Uniform Commercial Code and the purposes of Section 1141(c) of the Tax Law."

Events were thus proceeding according to plan when, in early August 1977, high officials of Southland received a letter from senior management announcing the establishment of a Business Ethics Review (BER) program. The cover letter was accompanied by an eight page questionnaire and an explanatory memorandum from Clark J. Matthews II, the general counsel. The questions inquired concerning knowledge of any payments to government officials to settle any disputes including tax disputes, knowledge of any payment to any government official to "grease" or expedite matters, knowledge of the existence of any off-the-book accounts or slush funds, knowledge of any laundering or other recycling of funds, etc. DeFalco called Dole, who had been one of the signers of the covering letter, and asked whether Dole had any problem with any of the questions. Dole answered that he didn't have a problem and asked if DeFalco did. DeFalco responded, "no, I don't have a problem anymore." DeFalco then answered the questions in the negative; Kitchen, after speaking with DeFalco, likewise omitted any mention of the Mastropieri matter. Pender, on the other hand, in responding to the question concerning "grease" payments to public officials, voiced his suspicion "that a payment made in the N/E Stores division to a law firm about July 1977 was inflated to cover costs other than legal fees. Dick Dole should have details."

Responsibility for supervising the BER was placed in Southland's Audit Committee, consisting of three outside directors who generally met once a month in the library of Southland's legal department. At some time during the first half of 1977, Matthews told the Audit Committee that Dole and DeFalco had approached him to pay a fee to a New York lawyer in the form of an airplane rental lease of $45,000. The Committee rejected this proposal and told Matthews to look into the matter further. As the BER got under way, Matthews took staff attorney Michael Davis on as an assistant for the project and instructed him to add the Mastropieri matter to the list of subjects for inquiry. While in Dallas at a business meeting on October 17 and 18, they interviewed DeFalco and Kitchen but not Pender or Dole.

The DeFalco interview disclosed a history conforming closely to what has been recounted. DeFalco said that part of the Mastropieri fee would be used for the "entertainment" of the Tax Commission members and staff; Davis, who took notes dur-

---

It is not disputed that "GM" means Eugene Mastropieri, JK means John Kelly, and ASAP means "as soon as possible."

ing the interview, later claimed that he understood this to mean "drinks, dinner, that kind of entertainment." There is a dispute whether a note by Davis, "Tully to get", was followed by a word reading "moving" or "money;" the jury could reasonably have found it to be the latter. After the conclusion of the interview Matthews, who was walking with DeFalco and Davis to the parking lot, suggested that maybe he should talk to Mastropieri "to flush out some details;" DeFalco said "I would not touch that with a ten foot pole," explaining—falsely as matters turned out—that "at least five thousand dollars of the payoff had already been made".

The interview with Kitchen produced an admission that he thought a payoff was discussed at the mid-February 1977 meeting at Hartford attended by Dole, Thompson and DeFalco; later he correspondingly amended the answer to his questionnaire. The Audit Committee apparently having instructed Matthews to interview Mastropieri, DeFalco assured the latter that this would be a charade. Subsequently Matthews advised the Committee that he had spoken to Mastropieri and obtained assurances that there were no irregularities in his representation of Southland. Mastropieri also contributed a letter for Matthews' files stating that his fee arrangement with Southland had been agreed to and paid. Later Matthews wrote a summary of the BER's discoveries in regard to the Mastropieri matters which will be described in Point III below. The final report on the BER, however, made no reference to the Mastropieri matter.

Still Matthews and Davis were understandably concerned that, without some action on their part, the Mastropieri "legal fee" was going to be taken as a deduction on Southland's 1977 income tax return and raised the question of deductibility with the company's outside tax counsel, without, however, stating why they considered that the "fee" might not be a proper deduction. Apparently by accident, an IRS audit team learned of the BER, and requested a copy of the report and the underlying questionnaires. Matthews met with Davis and

gave him a short list of names of persons whose answers to questionnaires should not be given to the IRS; the list included Pender and Kitchen. These questionnaires were withheld although the IRS agents were falsely assured they had been given all questionnaires with positive responses.

The final piece of evidence worth recounting concerned a conversation between DeFalco and Dole in November 1980, two months after DeFalco had been promoted to a vice presidency and assigned to the Dallas headquarters. Dole, who had become aware of the FBI's investigation of the Mastropieri fee and thought the bribe had been paid, called DeFalco and instructed him not to reveal the existence of the bribery scheme. During the course of the conversation, DeFalco wrote down on the back of an office telephone message slip:

11–24

Dole called—

Blood oath on N.Y. deal

Hang together or we all can get into trouble.

▇ In light of the facts which the jury was entitled to find, appellants' arguments with respect to insufficiency, including the argument that the coconspirators did not know that "heavy entertainment" could include bribery, border on the frivolous. The only ones even deserving mention are some of Southland's more particularized arguments. One of those is that the Government failed adequately to demonstrate that Southland was aware of 26 U.S.C. § 162(c) which forbids deduction of a bribe in determining net income. Ignorance of the law is no defense to a charge of purposeful and intentional action. *United States v. Gregg*, 612 F.2d 43, 51 (2 Cir.1979). Furthermore, the indictment did not turn on 26 U.S.C. § 162(c); the charge was conspiring to defraud the United States by obstructing the IRS in performing the function of determining Southland's allowable deductions, and it is absurd to suppose that the Southland officials concerned with the Mastropieri matter did not know that deductions may be taken only

for "ordinary and necessary" business expenses, 26 U.S.C. § 162(a), and that a bribe is not such an expense. Finally, there was evidence that Dole, DeFalco, Matthews and Davis were all very much concerned that the $96,500 payment was being improperly taken as a deduction.

A shade more needs to be said in regard to Southland's contention that the Government proved only an intent to deprive the State of New York of a fair hearing with respect to Southland's New York sales taxes rather than an intent to deprive the United States of income tax. It may well be true that when DeFalco began his relationship with Mastropieri, defrauding the United States was not in his mind. However, it was not too long before the conspirators became aware that the means chosen to conceal the payment of the intended bribe, a $96,500 legal fee, was almost certain to find its way into the deductions in Southland's 1977 income tax return. This is evidenced by the sending of the Form 1099 to Mastropieri, as well as much other conduct related heretofore and hereafter. If the Southland officials had wished to avoid defrauding the United States, they needed only to advise Southland's Treasurer that the $96,500 deduction for legal fees should not have been taken and that an amended return omitting this deduction should be filed. Section 371 has often been applied to reach conduct intended to defraud the United States, although the original activity was aimed at quite different objectives. A good example is *United States v. Parker*, 469 F.2d 884, 895–96 (10 Cir.1972). There the defendants made Molotov cocktails and other bombs to burn buildings belonging to their competitors and enemies. The court upheld their conviction under § 371 for conspiring to defraud the United States because they did not pay the required taxes on the explosive devices. Where defendants are shown to have intended to defraud the United States, they cannot escape liability by showing that this intent was merely incidental to some other action which constituted their primary motivation. *See United States v.*

*Barker,* 546 F.2d 940, 945 (D.C.Cir.1976) (Wilkey, J., concurring).

## II. *The Dual Statute of Limitations Instruction*

Judge Sifton charged the jury that a conspiracy to violate the Travel Act has a five year statute of limitations, *see* 18 U.S.C. § 3282. He further instructed that, in the language of 26 U.S.C. § 6531(1), the period of limitations is six years for "offenses arising under the internal revenue laws" and "involving the defrauding or attempting to defraud the United States or any agency thereof, whether by conspiracy or not." Hence, in order to convict under the portion of the indictment charging a conspiracy to violate the Travel Act the jury had to find an overt act within five years of the return of the indictment but to convict under the portion of the indictment charging a conspiracy to defraud the United States, it needed to find only an overt act within six years.

On its face the charge seems to be precisely what the statutes require. Clearly this is what the judge would have had to instruct if the indictment had contained two conspiracy counts instead of one. In opposition, appellants urge a somewhat metaphysical argument that since the indictment charges only one crime, there can be only one applicable period of limitations, just as there can be only one punishment, *see Braverman v. United States,* 317 U.S. 49, 53–54, 63 S.Ct. 99, 101–102, 87 L.Ed. 23 (1942). Whatever the philosophical merits of the argument may or may not be, we fail to see a good sense basis for it. If the Government adduced sufficient evidence to convince the jury that Southland conspired to defraud it within the six year period provided by 26 U.S.C. § 6531(1), as we have held that it did, we do not see why it should be deprived of a conviction for this violation of 18 U.S.C. § 371 because it failed to establish to the jury's satisfaction that Southland also engaged, during a five year period antedating the indictment, in a conspiracy to violate the Travel Act. Even more clearly, if the Government established

to the jury's satisfaction that Mastropieri had engaged in a conspiracy to violate the Travel Act within five years and to defraud the United States within six, we cannot see what is wrong in his being convicted for a conspiracy with both objectives. Any danger of jury confusion was eliminated by the taking of special verdicts as to each object. If the Government had failed to present sufficient substantive evidence to warrant submission of the Travel Act objective to the jury but did meet its burden with respect to the fraud objective and the jury convicted, defendants would surely not have been entitled to have the indictment dismissed. *See United States v. James*, 528 F.2d 999, 1014 (5 Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). We fail to perceive how their case stands better because the Government did present sufficient evidence to send to the jury the case with respect to both defendants and both objectives.

So far as the authorities are concerned, neither *United States v. Cunningham*, 723 F.2d 217 (2 Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984), nor *United States v. Fruehauf Corp.*, 577 F.2d 1038, 1069–70 (6 Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), gives the defendants the support that is claimed. On the other hand, *United States v. Albanese*, 123 F.Supp. 732 (S.D.N.Y.1954), *aff'd*, 224 F.2d 879 (2 Cir.), *cert. denied*, 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753 (1950), does not give the Government all the support for which it contends. This leaves us with *United States v. Head*, 641 F.2d 174 (4 Cir.1981), *cert. denied*, — U.S. ——, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983). The actual holding in that case was simply that where an indictment alleged a conspiracy with three unlawful objects, two of them carrying a five and one a six year period of limitations, and a question of limitations had been raised with respect to the former, it was error for the court to have instructed merely that it was enough for the Government to have proved that the defendant had conspired to violate one of the three statutes. Since the jury was asked only to render a general verdict, this created the possibility of a conviction solely as to objects subject to the five year statute although no act occurred within that period. After this clearly correct holding, the court added in an unnecessary footnote:

> The government contends that a five-year period applies only to a conspiracy to violate the bribery laws while a six-year period would apply to a conspiracy with tax objects.... While this may be true, we are not convinced that this difference would require the "hybrid" statute of limitations charge suggested by the government. In a multiple-object conspiracy where the object crimes bring into play differing statutes of limitations, the proper course may be to apply the rule of lenity in construing the statutes and apply the shorter limitations period to the entire conspiracy.

641 F.2d at 178 n. 5. Apart from the fact that all this was dictum, the court did not commit itself; it said only that "[i]n a multiple-object conspiracy where the object crimes bring into play different statutes of limitations, the proper course *may be* to apply the rule of lenity in construing the statutes and apply the shorter limitations period to the entire conspiracy." *Id.* (emphasis supplied). On further reflection the court might well have decided otherwise. In the first place the rule of lenity operates only where there is a fair basis for the construction urged by the defense, *see, e.g., Callanan v. United States*, 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961); *United States v. Moore*, 613 F.2d 1029, 1043–45 (D.C.Cir.1979); here we see none. Beyond that, as we have said before, we perceive no basis for invoking a rule of lenity in favor of defendants who have been proved to have conspired to take action condemned by 18 U.S.C. § 371 within the six year time limit provided by 26 U.S.C. § 6531(1) simply because they also have, or have not, been proved to be guilty of conspiracy to violate other statutes to which a five year period of limitations applies.

We hold that in this case, where special verdicts were taken, the dual statute of limitations instruction was proper.

## III. *Matthews' Notes*

Early in the trial the Government offered in evidence notes prepared by Southland's general counsel, Clark Matthews, which we quote in the margin.[3] This was the last of four yellow sheets found in a binder used by Southland's Legal Department to collect information discovered during the BER. The first three pages are an outline entitled "BER–Final Report to Board"; the only reference in these pages to the Mastropieri matter was "NY–Mastropieri Div Mg Thought Payment Outside Usual Controls." The final BER report made no reference to the Mastropieri matter, although Matthews then knew the scheme involved a bribery. The Government urged that the quoted note represented Matthews' real understanding of what had gone on. Judge Sifton initially declined to allow the note to be admitted, on the ground that "the portions of these notes relied on by the government are so cryptic that it seems to be speculative to attribute to these notes the meaning which the government argues they have" and that Matthews, the only witness who could explain the notes, intended to claim his Fifth Amendment privilege and would thus be unavailable. Upon urging by the Government, the court reexamined the issue but adhered to its decision. However, after Southland had completed its evidence and the last witness of the trial was on the stand, the judge announced that his views about the Matthews note had changed and admitted the entire exhibit. Southland objects that the note was speculative; that it was inadmissible hearsay; and that its admission violated the corporation's confrontation rights under the Sixth Amendment.

FRE 402 prescribes that, subject to certain exceptions not here material, "[a]ll relevant evidence is admissible," but FRE 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed" by certain dangers there outlined, a balancing which Judge Sifton here expressly resolved in favor of probative value. FRE 401 says that relevant evidence means:

> evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

As said in *Carter v. Hewitt*, 617 F.2d 961, 966 (3 Cir.1980), the "standard of relevance established by the Federal Rules of Evidence is not high." Particular deference is properly accorded to a ruling of the trial judge with respect to relevancy. *See, e.g., United States v. Catalano*, 491 F.2d 268, 273 (2 Cir.), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974); *United States v. Aulet*, 618 F.2d 182, 191 (2 Cir. 1980). He has a familiarity with the development of the evidence and the jury's reaction to it which an appellate court cannot equal. *See United States v. Robinson*, 560 F.2d 507, 514–15 (2 Cir.1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). Hence courts of appeals have sustained rulings admitting evidence quite as equivocal as Matthews' notes, *see, e.g., Tug Raven v. Trexler*, 419 F.2d 536, 543 (4 Cir.1969), *cert. denied*, 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970) (suicide by one member of crew of tug after fire admitted as possibly showing consciousness of guilt); *Carter v. Hewitt, supra*, 617 F.2d at 966 (letter by plaintiff encouraging filing of brutality complaints against prison guards admitted because it could be read as encouraging filing of false complaints of which plaintiff's was one). We have also ruled that great deference must be given to the trial judge's weighing under Rule 403. *See United States v. Robinson, supra*, 560 F.2d at 514–15.

---

**3.** NY Tax Comm–X
        —300m
Since 10/11/72  50 pending sales tax term franchisees contend fc sec int
10/76–5/77 paid 7/7/77
  abt. 200 stores

Kelly $107,757.92 phase out—take care of
  (camera)           for $40M to spread
              among mems tax comm
  (mtn & sec
  film kit)
  Mastropieri

■ The reasonableness of concluding that the Matthews notes revealed his knowledge of the true nature of the Mastropieri transaction had become much greater at the end of trial when the jury had learned that Matthews had interviewed DeFalco and had been told that Mastropieri had originally sought $40,000 to $50,000 in cash, that Matthews had also been approached to approve the payment of a $45,000 legal fee to Mastropieri in the form of a phony airplane lease, and that Matthews had been told by DeFalco not to interview Mastropieri because a bribe had already been paid. Judge Sifton's change in his ruling thus did not reflect capriciousness, as Southland's counsel suggests, but a reasoned reaction to changed circumstances.

■ Responding to the hearsay objection the Government asserts that the notes were admissible either because they were not hearsay, *see* Rules 801(d)(2)(D) (vicarious admissions), 801(c) (statement not offered to prove the truth of the matter asserted), 801(d)(2)(E) (statement by coconspirator during the course and in furtherance of the conspiracy), or under the exception in Rule 803(3) (statement of declarant's existing state of mind). Judge Sifton predicated admissibility on Rule 801(c). He directed the jury that "[t]he Matthews notes were ... admitted solely as bearing on their purported author's state of mind." Matthews' belief that a bribery had been planned was unquestionably relevant. If he knew that the Mastropieri transaction involved a bribe, this would tend to show that a number of his actions, and hence those of Southland, *see United States v.*

*Dotterweich*, 320 U.S. 277, 281, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943), *e.g.*, the failure to interview Pender, the withholding from the IRS of the Pender and Kitchen questionnaires, the perfunctory nature of the interview of Mastropieri and the report to the Audit Committee in regard to the same, the mockery of the discussion with outside tax counsel, the failure to disclose to the Audit Committee what Matthews thought was a $5000 payment on the bribe, were in furtherance of a conspiracy to obstruct the IRS in the performance of its functions.

When a declaration is admitted only to prove a relevant state of mind, it does not appear to matter, save perhaps as later indicated, whether admissibility is predicated on the declaration not being hearsay because it was not offered to prove the truth of the matter asserted, FRE 801(c), or under the hearsay exception for declaration of states of mind, FRE 803(3). Under either theory, "[a] state of mind can be proved circumstantially by statements ... which are not intended to assert the truth of the fact being proved," *see* 4 Weinstein, Evidence ¶ 803(3)[02], at 803–107 (1984). *See also Metzler v. United States*, 64 F.2d 203, 208 (9 Cir.1933) (letter from private detective to district attorney that county sheriff appointed by him was accepting protection money admissible to show district attorney's knowledge); *United States v. De Carlo*, 458 F.2d 358, 363–64 (3 Cir.) (en banc), *cert. denied*, 409 U.S. 843, 93 S.Ct. 107, 34 L.Ed.2d 83 (1972); *United States v. Taglione*, 546 F.2d 194, 200–01 (5 Cir.1977); *Mills v. Danson Oil Corp.*, 691 F.2d 715 (5 Cir.1982). We thus reject appellants' hearsay argument.[4]

---

**4.** Although it is not necessary to decide the point, we would not wish to be understood as foreclosing the Government's argument that the Matthews notes were outside the hearsay rule, and thus admissible against Southland, under FRE 801(d)(2)(D) as "a statement by [an] agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." The appellants contend that *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 816–17 (2 Cir. 1983), *cert. denied*, — U.S. —, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), requires that the author of the admission have personal knowledge, apparently meaning knowledge from non-hearsay

sources. We do not read the *Litton* opinion as going so far. The material excluded in *Litton* was merely notes of employee interviews; the opinion describes them as containing "multiple levels of hearsay" and refers to the recorded material as "gossip," citing 4 Weinstein, Evidence ¶ 801(d)(2), at 801–164 (1981). Here Matthews had obtained knowledge of the questionable nature of the Mastropieri fee in his capacity as general counsel before his assignment to the BER. Moreover, the *Litton* opinion does not cite the statement in the Advisory Committee's Notes:

■ We come finally to appellants' objection based on the Confrontation Clause. *See California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). It is not at all clear that the constitutional impediment against the receipt of extrajudicial declarations, whether within or, as in *Dutton*, without recognized exceptions to the hearsay rule, applies to a declaration which is not being used as proof of the fact stated, *see Dutton v. Evans, supra*, 400 U.S. at 88, 91 S.Ct. at 219 (plurality opinion). The contention likewise seems hardly appropriate when voiced by Southland, since the witness it wishes to confront is, in the eyes of the law, itself. *United States v. Dotterweich, supra*, 320 U.S. at 281, 64 S.Ct. at 136. However, assuming that both defendants are entitled to raise objection under the Confrontation Clause, we think Matthews' notes had sufficient assurances of reliability, particularly when they were received only as proof of his belief that a bribery had been planned. *Dutton v. Evans, supra*, 400 U.S. at 88–89, 91 S.Ct. at 219. Matthews had no motive to make unfair accusations against anyone; to the contrary, his own involvement in the Mastropieri scheme and his concealment of facts from the Audit Committee gave him every inducement not to memorialize his beliefs unless he thought them true. Indeed the notes were later used as a basis for prosecuting Matthews for conspiracy to defraud the Government. *United States v. Matthews*, 601 F.Supp. 430 (E.D.N.Y.1985). Matthews' contact with the Mastropieri matter both as it transpired and in the course of the BER gave him considerable firsthand knowledge of the planned bribe. DeFalco's testimony, which was subject to cross-examination, corroborated Matthews' notes in many respects. *Cf. United States v. Wright*, 588 F.2d 31, 38 (2 Cir.1978), *cert. denied*, 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979). Furthermore the notes were neither "crucial" to the Government's case nor "devastating" to the defense. *See Dutton v. Evans, supra*, 400 U.S. at 87, 91 S.Ct. at 219. They dealt primarily with the bribery objective; the jury reached no verdict on this as respects Southland and the other evidence with respect to Mastropieri was overwhelming, at least unless the jury must be supposed to have been so gullible as not to understand what was meant by "heavy entertaining."

## IV. *The Exclusion of a Portion of Mastropieri's Grand Jury Testimony, and herein of the Sealing of the Indictment*

After having brought out the fact of Mastropieri's receipt of IRS Form 1099 in relation to the legal bill for $96,500, the Government introduced an excerpt from his grand jury testimony reading as follows:

Q: As a result of receiving this [Form] 1099, Grand Jury Exhibit 18, did you know that the Southland Corporation was reporting the fact that you had received a fee of $96,500?

A. Yes.

However, the court refused to allow Mastropieri to introduce testimony immediately

---

The freedom which admissions have enjoyed from ... the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, call for generous treatment of this avenue of admissibility.

FRE 801(d)(2)(D) advisory committee note. The only case cited in *Litton* on this point, *Northern Oil Co. v. Socony Mobil Oil Co.*, 347 F.2d 81, 83 (2 Cir.1965), antedates the Rules, and the Third Circuit has thought it to be "clear from the Advisory Committee Notes that the drafters intended that the personal knowledge foundation requirement of Rule 602 should apply to hearsay statements admissible as exceptions under Rules 803 and 804 but not to admissions (including coconspirator statements) admissible under Rule 801(d)(2)." *United States v. Ammar*, 714 F.2d 238, 254, *cert. denied*, — U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983) (footnote omitted). The Seventh and Eighth Circuits agree; *see Mahlandt v. Wild Canid Survival & Research Center*, 588 F.2d 626 (8 Cir.1978); *MCI Communications v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1143 (7 Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Reconciliation of Rule 801(d)(2)(D) and Rule 602 should await a case where this is essential.

following this. After admitting his realization that Southland would be deducting the $96,500 as a legal fee, Mastropieri said that he had called DeFalco and complained about Southland's reporting the $96,500 as income to him when it knew that he had not actually received any funds. According to Mastropieri, DeFalco said that he would "take care of the matter" and that Mastropieri shouldn't worry about it. Mastropieri said he was not going to report "one cent of this $96,500" and thought DeFalco had said it was a mistake—"I should not have gotten this thing." Mastropieri contends that this testimony might have led the jury to conclude that he had taken steps which he could have expected would lead Southland not to have taken the deduction, thereby negating any intent on his part to defraud the Government.

FRE 106 provides that:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

We have interpreted this rule "to require that a statement must be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact ... or to ensure a 'fair and impartial understanding' of the admitted portion." *United States v. Marin*, 669 F.2d 73, 84 (2 Cir. 1982). This is a principle of simple fairness, long antedating the Federal Rules of Evidence, *see United States v. Stone*, 282 F.2d 547, 551–52 (2 Cir.), *cert. denied*, 364 U.S. 928, 81 S.Ct. 353, 5 L.Ed.2d 266 (1960) (also involving refusal to admit a portion of a defendant's grand jury testimony). The district judge was in error in relying on *Marin* as a basis for exclusion; there the excluded portion related to a subject that had been excised from the statement that was admitted and that was "neither explanatory of nor relevant to the admitted passages", *see also* 669 F.2d at 85 n. 6. There is nothing in the Government's point that a part of the excluded testimony was favorable to it; Mastropieri still may rightfully complain of the exclusion of the parts that were not.

■ This, however, does not lead us to reverse the appellants' convictions. Excluding these portions of Mastropieri's grand jury testimony had no effect upon Southland. Even as to Mastropieri, the excluded portion of the testimony bore only on the fraud objective; it had no probative effect with respect to Mastropieri's guilt for conspiracy to violate the Travel Act. Were it not for a question concerning the running of the statute of limitations on the Travel Act objective discussed below, this would end the matter as Mastropieri's conviction could be upheld so long as he agreed to accomplish at least one of the criminal objectives charged. *United States v. Papadakis*, 510 F.2d 287, 297 (2 Cir. 1975). Despite the limitations question, we still rule in the Government's favor since although the limitations point is of first impression in this court, we think the Government is correct. We therefore need not consider the Government's alternative argument that the exclusion of portions of Mastropieri's grand jury testimony was harmless error even in respect of the fraud charge.

■ The statute of limitations point is this: Mastropieri claims, and the Government does not dispute, that the last overt act charged against him in the bribery part of the conspiracy occurred on March 27, 1978. The predecessor of the instant indictment was returned by the grand jury on March 25, 1983. However, the Government obtained an order sealing the indictment; the basis for this was that announcement of the indictment would make it more difficult for the Government to obtain complete and truthful testimony from Frank Kitchen, a vice president of Southland who had been granted immunity, *see Matter of Kitchen*, 706 F.2d 1266 (2 Cir.1983). After this court's decision on April 27, 1983 made it evident to the Government that no purpose would be served by recalling Kitchen before the grand jury, the indictment was

unsealed on May 5, 1983. Judge Sifton found that the sealing, for a period of six weeks, lasted no longer than was necessary to accommodate legitimate prosecutorial interests. Mastropieri contends that there was no legal basis for the ruling and that May 5, 1983 must be taken as the date of the return of the indictment, thus barring prosecution for conspiracy to violate the Travel Act. He relies on two reasons. One is that under F.R.Cr.P. 6(e)(4) an indictment may be sealed only to assist in achieving custody of the defendant; the other is that if sealing is permitted for any other purpose, there was no proper purpose here.

Under both 18 U.S.C. § 3282 and 26 U.S.C. § 6531, the indictment must be "found" within the statutory periods. Read literally this does not require that the indictment must be made public. However, F.R.Crim.P. 6(e)(4) provides:

> Sealed Indictments. The federal magistrate to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. Thereupon the clerk shall seal the indictment and no person shall disclose the return of the indictment except when necessary for the issuance and execution of a warrant or summons.

Mastropieri insists that no reason except the one mentioned in the Rule can justify the sealing of an indictment.

There is a surprising dearth of authority upon the subject. In *United States v. Michael*, 180 F.2d 55, 57 (3 Cir.1949), *cert. denied sub nom. United States v. Knight*, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950), decided only three years after the Criminal Rules were adopted, the court stated in an opinion by Judge Maris:

> Criminal Procedure Rule 6(e) authorizes indictments to be kept secret during the time required to take the defendant into custody. If such secrecy may lawfully be imposed in that situation we see nothing unlawful in the court imposing secrecy in other circumstances which in the exercise of a sound discretion it finds call for such action.

(footnote omitted). The court would scarcely have said this if the taking of custody had been the sole objective.[5]

The notes of the Advisory Committee written when Rule 6(e) was adopted in 1946 say cryptically that "[t]he ... sentence authorizing the court to seal indictments continues present practice." Such evidence as we have found suggests that the practice at the time the Rule was written allowed courts to seal indictments for reasons other than obtaining custody of the defendants. A treatise of the period, which described itself as focusing on "what is and not what has been or should be," reflects this in its statement that *"[w]here the public interest requires it, or for other sufficient reason, the court may order an indictment to be sealed."* Housel & Walser, *Defending and Prosecuting Federal Criminal Cases* § 230, at 300 (2d ed. 1946) (emphasis supplied). *Accord* 1 Matthews, *How to Try a Federal Criminal Case* § 215, at 318–19 (1960). At a symposium on the new Rules of Criminal Procedure sponsored by the New York University School of Law in collaboration with the American Bar Association, the New York State Bar Associa-

---

**5.** Examination of the briefs in the Third Circuit tend to confirm this. While, in their statements of fact, the parties merely note the sealing of the indictment without providing relevant details, the appellants stated in a Supplemental Brief on Reargument:

> The docket entry discloses no reason for the impoundment [of the indictment]. One thing, however, is certain. It was not for the purpose of facilitating the apprehension of the accused.... Why the indictment was thus arbitrarily and indefinitely impounded must remain a matter of conjecture.

This statement that custody could not have been the purpose for the sealing is further supported by the fact that the defendants were reputable members of the Pittsburg business community and do not appear to have been the type of individuals who would have gone "underground" to evade capture by the authorities; when the presiding judge unsealed the indictment, he refused the United States Attorney's request that bench warrants be issued for the defendants and directed that the accused be notified by letter or telephone to appear for arraignment.

tion and the Federal Bar Association, George Medalie—Associate Judge of the New York Court of Appeals, former United States Attorney for the Southern District of New York, and member of the Supreme Court Advisory Committee on the Criminal Rules—stated before a panel chaired by Judge Learned Hand, that Rule 6 contained:

> the usual provision for the sealing of the indictment, where the district attorney or the attorney general is of the opinion that the indictment having been procured, *for sound reasons of policy*, nothing should be done for a while, no publication made of the fact. That, of course, is present practice.

VI *Proceedings of the New York University Law School Institute on the Federal Rules of Criminal Procedure* 155 (1946) (emphasis supplied). Further support for this view comes from comments received by the Supreme Court's Advisory Committee after circulation of its initial draft of the Rules.[6] For example, one attorney wrote the Committee to complain about "the increasing practice of using sealed indictments where it was unnecessary." 1 Orfield, *Criminal Procedure Under the Federal Rules* § 6:2, at 348 (1966). Another attorney proposed that the Rules contain "a provision prohibiting secret or sealed indictments as to defendants already subject to the jurisdiction of the court." *Id.*

If, as we are therefore confident, the practice before adoption of the Rule permitted the sealing of indictments for reasons other than obtaining custody, we do not believe the intention was to restrict it. The Federal Rules of Criminal Procedure were not intended to be exhaustive. As a member of the Supreme Court Advisory Committee stated at the time, "many now accepted practices and judicial powers are omitted from the proposed Rules without intent that the omission shall be considered

by implication a repeal thereof." Waite, *The Proposed Federal Rules of Criminal Procedure*, 27 J.Am.Jur.Soc. 101 (1943). If the Rule were read literally, a defendant who was subject to arrest on the return of the indictment could object to a sealing to facilitate the arrest of codefendants; yet the Rule has never been read that way. *See United States v. Watson*, 599 F.2d 1149, 1155 (2 Cir.1979), *rev'd on other grounds sub nom. United States v. Muse*, 633 F.2d 1041 (2 Cir.1980) (en banc), *cert. denied*, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981). The limiting effect of the Rule was to place sealing in the hands of a judicial officer rather than as theretofore in those of a prosecutor. 1 Orfield, *Criminal Procedure Under the Federal Rules, supra*, § 6:1, at 341. In sum, we see no reason for disagreeing with the *Michael* decision, rendered only three years after adoption of the Rule, a time when the intention of the framers was far better known than it now can be.

The question remains whether the prosecutorial objectives here sought to be obtained justified the sealing of the indictment. This is a point on which great deference should be accorded to the discretion of the magistrate, at least in the absence of any evidence of substantial prejudice to the defendant. The Government should be able, except in the most extraordinary cases, to rely on that decision rather than risk dismissal of an indictment, the sealing of which it might have been willing to forego, because an appellate court sees things differently, after the expenditure of vast resources at a trial and at a time when reindictment is by hypothesis impossible. Mastropieri has not even asserted prejudice from the sealing of the indictment for 39 days after the statute had run. Obviously he had been on notice of the likelihood of indictment and could have begun his prepa-

---

**6.** The preliminary draft of Rule 6 of Federal Criminal Procedure provided that:

> The court may direct that the indictment shall be kept secret until the defendant is in custody or has given bail and the clerk shall seal the indictment and in that event no person

shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons.

Except for minor stylistic revisions, this language is identical to that in the Rule which was eventually adopted.

ration for trial long before the end of the statutory period, *see United States v. Watson, supra,* 599 F.2d at 1154.

### V. *Mastropieri's Argument that the Government Forfeited its Right to Prosecute by Failing to Indict him on or before September 30, 1982*

■ An argument which can be dealt with much more swiftly is one made by Mastropieri that the Government forfeited its right to prosecute him by an agreement made on July 22, 1982. This reads in pertinent part:

> Eugene Mastropieri hereby waives and shall not assert the defense that any prosecution for any crime incident to the retention by and representation of the Southland Corporation by Eugene Mastropieri is barred by the statute of limitations, provided that any such prosecution shall be brought on or before September 30, 1982.

The background of the agreement was this: The Government feared in the summer of 1982 that it might be having limitations problems with respect to Mastropieri[7] but the latter wished to appear before the grand jury to present his side of the case. The Government was willing to accommodate him provided he would waive any statute of limitations defense if an indictment was brought on or before September 30, 1982. When it became clear that the grand jury would not finish its deliberations by that date, the Government sought a further waiver which Mastropieri declined to give.

After the indictment returned on March 25, 1983, was unsealed, Mastropieri moved to dismiss it on the basis of his waiver. The district judge denied this, saying that "the defendant is not so clearly right in his argument ... that the issue can be decided on a motion to dismiss." Characterizing this as a "factual finding of ambiguity by the trial court," and citing numerous inapposite decisions, Mastropieri asks that we

**7.** The Government had similar concerns as regards Southland, and the corporation executed an identically worded waiver on the same date as Mastropieri. At the Government's request,

dismiss the indictment because the Government breached a promise to indict him on or before September 30, 1982, if at all.

We see no force whatever in this argument. Mastropieri made a limited waiver of the statute of limitations; the Government did not promise anything. It is not asserting that Mastropieri has waived his right to contend that the indictment was found too late. He makes no contention that the indictment was not timely "found". Although Mastropieri argues that it would have been untimely if we should determine that the date of unsealing rather than the date of finding controls, the Government, while disputing the argument, does not challenge his right to make it. Judge Sifton made no "finding" that the agreement meant what Mastropieri said. No legal consequences arise from his having denied Mastropieri's motion on the ground that Mastropieri was not clearly right rather than, as we would have done, on the ground that he was clearly wrong.

### VI. *Refusal to Charge a Violation of 26 U.S.C. § 7207 as a Lesser Included Offense*

Section 7207 of the IRC provides:

> Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.

This crime being a misdemeanor, under 18 U.S.C. § 371 conspiracy to commit it likewise is a misdemeanor. The judge denied defendants' requests to charge that if the jury did not find that they had committed the felony of conspiring to defraud the United States by impeding the functioning of the IRS, it might nevertheless find that defendants conspired to violate § 7207.

Southland subsequently extended its waiver through May 5, 1983, the date of the expiration of the term of the grand jury investigating the matter.

We have held that a defendant is entitled to a lesser included offense instruction if: (1) all of the elements of the lesser offense (§ 7207) were also elements of the greater offense (§ 371), *see United States v. Giampino*, 680 F.2d 898 (2 Cir. 1982), and, (2) the greater offense has one additional element not found in the lesser offense that the jury would be justified in finding the government had failed to prove beyond a reasonable doubt. *United States v. Garcia-Duarte*, 718 F.2d 42 (2 Cir. 1983). There is no dispute that the first condition was met; the elements of a conspiracy to file a return known to the maker to be fraudulent or false as to any material matter (§ 7207) would also constitute elements of a conspiracy to defraud the United States by impeding the functioning of the IRS. The debated question relates to the second condition, which the Government contends was absent.

The Court said in *Sansone v. United States*, 380 U.S. 343, 350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965):

A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense.

In *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973), the Court phrased the test as being whether "the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." *See also United States v. Markis*, 352 F.2d 860, 865–67 (2 Cir.1965), *vacated on other grounds*, 387 U.S. 425, 87 S.Ct. 1709, 18 L.Ed.2d 864 (1967).

■ We fail to see what this additional element would be. Once the jury decided that Southland had filed a return taking a deduction for legal expenses which it knew had not been incurred, as the jury would have had to do in order to find a violation of 26 U.S.C. § 7207, it would have decided every element necessary to convict South-

land of defrauding the United States under 18 U.S.C. § 371. This is particularly clear in light of *United States v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), which held that § 7207 requires proof of the same degree of *scienter* as criminal tax felony statutes using the adverb "willfully", and consequently reversed the Court of Appeals for the Ninth Circuit which had reversed a district court for refusing to give lesser included offense instructions in a case where the defendant had been charged with violating 26 U.S.C. § 7206. If, as held in *Bishop*, 412 U.S. at 360–61, 93 S.Ct. at 2017, a conviction of defendants for violating § 7207 would have required proof of "bad purpose or evil motive" in the sense described in *United States v. Murdock*, 290 U.S. 389, 394–95, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933), no more is needed to establish the "intent to defraud" required by § 371.

■ Defendants argue that the jury could have found that they agreed purposefully to file a false tax return in violation of § 7207, without finding that they intended to defraud the United States of revenue. Even if such a finding by the jury were possible, it is of no aid to the defendants. The Government need not prove that the defendants intended to defraud the United States of revenue to establish a violation of § 371. Conspiracy to defraud the United States includes attempts to "interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation...." *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). Accordingly, once the jury determined that the defendants violated § 7207 by deliberately filing a false tax return, it would also have decided that they conspired in violation of § 371 to defraud the United States by interfering with the lawful function of the

IRS in ascertaining Southland's legitimate tax deductions.

Defendants argue that the indictment charged not broadly that they conspired to defraud the United States, which is all that the statute requires, but that they agreed that the defrauding should be accomplished "by impeding, obstructing and defeating the lawful functions of the Internal Revenue Service of the Treasury Department of the United States in the ascertainment, computation, assessment and collection of income taxes, to wit: by conducting their business affairs and financial transactions in a manner which would prevent the Internal Revenue Service from ascertaining the true and correct nature of business expense deductions...." But the means by which defendants did this was the filing of a return which took a $96,500 deduction for legal fees to which the defendants knew the corporation was not entitled. This is precisely what the Government would have to prove to establish a conspiracy to violate § 7207. We see nothing to the contrary in *United States v. Tarnopol,* 561 F.2d 466 (3 Cir.1977), on which Southland heavily relies. The case had nothing to do with failure to charge a lesser included offense; the reversal there was because of the judge's having submitted a conspiracy count with an instruction that the jury could bring in a guilty verdict if it found that defendants had acted in pursuit of any of three objectives when there was insufficient evidence with respect to one, namely, a conspiracy to defraud the United States under § 371. 561 F.2d at 474.

The judgments of conviction are affirmed.